**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | | |
|---|---|---|
| FORCE PARTNERS, LLC,<br><br>Plaintiff,<br>vs.<br><br>KSA LIGHTING & CONTROLS, INC; ACUITY BRANDS, INC., JIM WILLIAMS; and ASHLEY WILLIAMS,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 19 CV 7776<br><br>Jury Demand |

**COMPLAINT**

Plaintiff Force Partners, LLC, by and through its undersigned counsel at Scharf Banks Marmor LLC alleges for its Complaint at Law as follows:

**NATURE OF THE CASE**

1. This case seeks redress for an ongoing and multifaceted conspiracy between Defendants KSA Lighting & Controls, Inc. ("KSA") (a sales representative of lighting and control products), Acuity Brands, Inc. ("Acuity") (for which KSA is the exclusive representative in the relevant market), KSA's President Jim Williams, and KSA's erstwhile Vice President of Distributor Solutions Ashley Williams. The defendants all participated in a conspiracy to force distributors of lighting and control products in the Chicago metropolitan area to boycott Plaintiff Force Partners, LLC ("Force Partners") and force this competitor of KSA, and the brands it represents, out of the relevant greater Chicagoland market. Defendants' aim is clear: to foreclose competition and raise barriers to entry into the lighting and control products market. By so doing, Defendants will reduce consumer choice and raise prices – and margins – on Acuity products and the other brands KSA represents.

2. The relevant customers in this market are approximately 24 distributors who purchase lighting and control products both for commercial and industrial projects and for their own shelves to sell to end users. These distributors have reported a series of lies, threats, and coercions that led to the reluctant conclusion that these distributors must agree with the demands of the Defendants or risk losing access to the brands controlled by Defendant KSA, including Acuity, which is the largest lighting manufacturer in North America.

3. Plaintiff Force Partners is a relatively new entrant to the greater Chicagoland market, but in the two years since its formation, it has made significant inroads into KSA's dominant market share. Starting in August 2019, Force Partners began hearing troubling stories about secretive PowerPoint presentations made by Jim and Ashley Williams – and in at least one case by Acuity's Senior Vice President of Sales John Mabbott – to approximately 24 distributors, who represent as much as 90% of Force Partners' sales and are the most significant distributors in the greater Chicagoland market. These PowerPoint presentations, which distributors reported appeared to have been prepared by both Acuity and KSA, reportedly called on distributors to cease (or severely limit) doing business with Force Partners based on a lie: that Force Partners was making sales directly to down-stream users like general contractors and end users, and thus denying distributors their margin on such sales. Notably, KSA also complained that Force Partners was affecting its margins – betraying the fact that it was seeking to restrain price competition by attacking its competitor.

4. Lighting products distributors in the greater Chicagoland market are not exclusive. In order to best meet the needs of its customers, they carry the products of a number of manufacturers in their inventory and also source products on a custom basis for "spec" commercial and industrial projects. The scheme proposed in the KSA/Acuity PowerPoint presentation

meetings in August was that if the distributors wanted to continue doing business as usual with KSA (and Acuity and the other brands it represents) they would have to agree to be "Partners" with KSA. To be a "Partner," distributors had to agree to curtail working with Force Partners and their brands, which included Eaton Lighting (also known as Cooper Lighting Solutions), a significant competitor to Acuity. Specifically, distributors were told that they would have to rig bids to ensure KSA won commercial or industrial spec projects; and those distributors who also carried Force Partners' brands' products on their shelves were told it had to be removed – all by October 1, 2019. Any distributor who did not agree to be a "Partner" would be deemed an "Associate," and would not get KSA's "best prices" – meaning they would not be able to get KSA's brands' product at a viable price. As many distributors have told Force Partners, because KSA represents as much as 40%-70% of their lighting and control business, they could not afford to refuse its demands. No procompetitive or efficiency enhancing justifications for the defendants' actions were offered. Nor, indeed, was any contract offered to the distributors that, for example, would protect them from future price increases once KSA's (and Acuity's) competitor is forced out of the market. As one distributor put it, the incentive KSA offered to go along with its scheme was "no carrot, only stick."

5. Starting in September, after months of upward sales momentum, Force Partners began to see its sales drop significantly, suggesting the scheme has been implemented and has started to produce the intended effects. KSA's CEO has told distributors it will enforce its demands, starting with inspections of the inventory of those distributors who carry Force Partners' brands in their physical branch locations, to ensure they have been removed. The inevitable result of defendants' program will be to increase prices to the purchasers of lighting products, because competition for inventory or bid items will be eliminated. Chicago-area purchasers of lighting

products will lose the ability to benefit from the price and variety competition that previously was available. Given the high barriers to entry, if KSA and Acuity's scheme persists and succeeds, they will create a monopoly in this market and consumers will suffer loss of choice and higher prices.

## PARTIES

6. Plaintiff Force Partners, LLC ("Force Partners") is an Illinois limited liability company with offices at 121 West Wacker, Suite 3900, Chicago, Illinois and at 760 Pasquinelli Drive, Suite 314, Westmont, Illinois. All of its members are citizens of Illinois and none of its members are publicly traded corporations.

7. Defendant KSA Lighting & Controls, Inc. ("KSA") is a corporation with its principal place of business at 1220 Central Avenue, Hanover Park, Illinois, and is incorporated under the laws of the state of Illinois.

8. Defendant Acuity Brands, Inc. ("Acuity") is a corporation with its principal place of business at 170 Peachtree Street, NE Suite 2300, Atlanta, Georgia, and is incorporated under the laws of the state of Delaware. Acuity does business in the Chicagoland and northern Indiana area through its sales agent KSA, through distributors that resell its products, and through distribution facilities located in Hanover Park, Illinois and Des Plaines, Illinois.

9. Defendant Jim Williams is an individual who on information and belief resides in the Northern District of Illinois and does business in this District. Mr. Williams is the President of KSA.

10. Defendant Ashley Williams is an individual who on information and belief resides in the Northern District of Illinois and does business in this District. Mrs. Williams is listed on KSA's website as the "Vice President Distributor Solutions" at KSA, but on information and belief was fired from her position during the course of the actions described in this complaint.

11. In addition to the named Defendants, relevant distributors in the Chicago metropolitan area have agreed to comply with and enforce the illegal terms imposed by Acuity and KSA, albeit unwillingly.

12. Defendants are jointly and severally liable for the acts of their co-conspirators whether named or not named as defendants in this Complaint.

13. All parties are engaged in, and their activities substantially affect, interstate trade and commerce.

**JURISDICTION AND VENUE**

14. The Court has original subject matter jurisdiction over this action pursuant to 28 U.S.C. 1331 and 28 U.S.C. 1137 because some of plaintiff's causes of action sound under the Sherman Antitrust Act, 15 U.S.C. §§ 1-7 ("Sherman Act"), as well as under the Clayton Antitrust Act, 15 U.S.C. §§ 12-27 ("Clayton Act").

15. The Court has personal jurisdiction over each defendant under the Illinois long-arm statute, 735 Ill. Comp. Stat. 5/2-209, as well as under the Sherman Act and Clayton Act. All defendants transact systematic and continuous business in Illinois. Further, some or all of the anticompetitive conduct alleged herein occurred in Illinois, and the anticompetitive effects of the conduct alleged herein have impacted consumers in Illinois. In addition, defendant Acuity joined in a conspiracy with Illinois-based defendant KSA, who committed overt acts in furtherance of the conspiracy in Illinois, and the conspiracy caused foreseeable anticompetitive effects in Illinois.

16. Venue is proper in the Northern District of Illinois under 28 U.S.C. 1391 because both Force Partners and KSA reside in this District, as do Mr. and Mrs. Williams. In addition,

a substantial part of the events or omissions giving rise to the claim occurred within this District.

## ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

### A. The Lighting and Controls Sales Representative Business in the Relevant Market.

17. Force Partners and KSA both are sales representatives engaged in the lighting and controls agency business. Each of these competitors acts as the exclusive sales representative for particular lighting and controls manufacturers in the metropolitan Chicago area.

18. Lighting and controls manufacturers hire or contract with exclusive sales representatives to cover a defined geographic territory. The manufacturer's designated sales representative is the only authorized marketer of the designated brands in the specified area to downstream channels.

19. Sales representative agencies like KSA and Force Partners have agreements that define their territories. The relevant geographic market in this case is comprised of 16 Illinois counties surrounding Chicago as well as three counties in Northwest Indiana ("greater Chicagoland market"). The Illinois counties are: Boone, Cook, DeKalb, DuPage, Grundy, Kane, Kankakee, Kendall, Lake, LaSalle, Lee, McHenry, Ogle, Stephenson, Will, and Winnebago. The Indiana counties are: Lake, LaPorte, and Porter. On information and belief, KSA's agreements with Acuity and its other brands define its territory in the greater Chicagoland market as these counties.

20. Sales representatives may represent other manufacturers' products in the same geographic territory. For example, Force Partners represents approximately 65 different lighting manufacturers (the largest manufacturer is Eaton Lighting ("Eaton"), which has 21 sub-brands, including, for example, Halo, Metalux, and SureLite) in the geographic market limited to sixteen Illinois counties in the Chicagoland area and three counties in Northwest Indiana.

21. KSA also exclusively represents a different set of approximately 150 lighting manufacturers (including Acuity Brands) in this same geographic territory, as well as additional territories including counties in central Illinois, and counties in Eastern Iowa. Acuity Brands is, according to the United States Department of Energy, the largest manufacturer of lighting products in North America.

22. Assigning exclusive territories to sales representative enables manufacturers to build and maintain brand sales through relationships with local distributors, contractors, builders, and designers in the construction industry. These exclusive contracts mean it is not easy to obtain a sales representative's products through other means or channels.

23. Manufacturers' sales representatives sell downstream through a few primary channels:

a. Stock and flow distributors: these distributor's inventory (on their shelves), a variety of brands in a physical showroom, counter area, or warehouse, that serves the "on-demand" needs of small to mid-sized electrical contractors and builder customers doing new or replacement construction work, as well as a limited number of retail customers and homeowners.

b. Project/specification distributors: these distributors supply larger building projects and provide materials management services to coordinate or direct goods to local staging areas at the time that builders/contractors need the supplies. Materials management is an important service offered by project houses that is typically not available from stock and flow distributors. Some project/specification distributors maintain limited inventory of stocked products.

c. Some distributors deal in both stock and flow distribution and project/specification work.

24. Sales representatives can provide budget quotes directly to contractors, but the quote will include extra margin for the distributor. Such quotes do not and cannot cut distributors out of sales because the distributors offer a consolidation point along with financing, with terms and rebates that go back to the contractors. Salespeople who work for the representative firms and focus on calling on the contractors to influence what manufacturers they will select for projects, and rely in such efforts on the sale representative's value-add services and their relationships with the contractors, but the transaction and sale always goes through distributors.

25. In the greater Chicagoland market, over 75% of trade in the relevant market is handled by approximately 24 distributors.

26. There are comparatively few "full line" manufacturer's representative companies – those that supply lighting and control products in the Chicagoland area, and can offer distributors a competitive "full package" of products for project/specification bids. KSA has a dominant share of many distributor's lighting sales, which is between 40% and 70% by distributors' estimates.

27. Both KSA and Acuity have market power in the greater Chicagoland market.

28. There are other sales representatives in the area that carry a smaller set of lighting brands and products and do not offer a "full line." These sales reps are niche players with a limited line of products, or otherwise specialize in decorative/specialty products, and do not provide a competitive constraint on the full line suppliers.

29. Bidding data available from "Construct Connect" (a bidding platform that collects public construction data) shows that between 2017 and August 2019, KSA, Force Partners, PG enlighten, and CLW were the largest four sales representative suppliers of lighting and control

products in the Chicagoland market, representing approximately 59.5%, 23%, 10%, and 7.5%, respectively, of specified and approved products of the top four firms in the project/specification market. During this period, the data shows that both KSA's and Force Partners' shares of approved, specified products in bidding opportunities were growing amongst the top four representatives, whereas the shares for PG enlighten and CLW were declining between 2017 and August 2019 amongst the largest four firms. In short, Force Partners was KSA's closest competitor by share of specified product categories.

30. Approximately 65% of Force Partners' sales are project/specification work and 35% is stock sales (more specifically, 50% pure project, 15% combination of project/stock, and 35% stock).

31. Manufacturers' representative agencies who specialize in lighting have been described as "a separate breed of rep given their influence over how specifications are written in many geographic markets."

32. Both Force Partners and KSA sell products targeted to a specific audience and its particular needs.

33. The participants in the lighting and controls, manufacturers use sales representatives to sell to and through distributors. Architects, lighting designers, and engineers develop specifications for construction projects, and have interactions with manufacturer sales representatives in an effort to get their products specified for an upcoming project installation. Specifications for new construction projects in this market typically encompass many different product lines for lighting and controls. Architects and lighting designers usually list between one to three acceptable alternative manufacturers for each fixture type. Sometimes these specifications list only one manufacturer's name, which indicates a "hard spec" with no substitution; other

specifications list as many as three manufacturers' names, which means any one of them is pre-approved and acceptable and invites competition to supply the specified products.

34. The distributors, however, are the direct purchasers of lighting products and controls from the manufacturers and their representative firm; contractors and end-users are the indirect purchasers of the products.

35. Distributors in the lighting market benefit in numerous ways from competition among sales representatives like KSA and Force Partners. These include the ability to identify the best price and service options for their clients among available manufacturers, who expect distributors to offer complete solutions for their lighting and control needs.

36. Acuity's 2018 Form 10-K observes that "Aggressive pricing actions by competitors, including Asian importers and those within the technology and services sectors, may affect the Company's ability to achieve desired revenue growth and profitability levels under its current pricing strategies."

### B. The Importance of Competition from Force Partners and Anticompetitive Effects of KSA's and Acuity's Conduct

37. Force Partners has become the most important competitor to KSA and Acuity in the relevant market. Force Partners came into being when another manufacturer representative firm was enticed by one of the other large lighting and controls manufactures – Hubbell Lighting – to cease its exclusive representation of Eaton Lighting in the Chicagoland market.

38. Without a representative in this market, Eaton was unable to gain access to distributors in any meaningful fashion, and had to find an alternative sales rep agency. In 2017, Eaton convinced the two principals of Force Partners to form this company and become its exclusive representative in the greater Chicagoland market.

39. In the following two years, Force Partners quickly became KSA's most significant competitor and saw its sales rise in most of the counties in which it operates and which make up the relevant market.

40. However, Force Partners has found itself almost entirely unable to penetrate the three Northwest Indiana counties that are part of the greater Chicagoland market. There, KSA controls nearly 90% of sales. Force Partners suspects that some of the same heavy-handed tactics KSA is trying to use in the Illinois counties have been used in Indiana.

41. In an effort to test the market, Force Partners has offered steeply discounted prices – prices it is confident are lower than KSA's – to win spec jobs in Northwest Indiana. Virtually none have been successful. Indeed, in the last two years, Force Partners has won only two out of 42 spec bid projects of over $50,000 in Northwest Indiana. This is in stark contrast to its experience – until recent events – in Illinois.

42. Force Partners' experience, both in its formation and in its efforts to grow in the relevant market, show that the barriers to entry for sales representatives in this market are high. Should KSA's scheme succeed, the barriers will only become higher, with obvious effects on consumer choice and on prices.

43. Force Partners' experience in Indiana shows that once KSA takes over a market segment, it can be difficult and perhaps impossible for another competitor to enter or effectively compete.

44. The program advanced by KSA and Acuity inevitably will result in increased consumer prices. KSA presents the distributors with a "Hobson's Choice" of being captive or losing the key products they need to compete. By removing the ability of distributors to quote from multiple manufacturers, the possibility of price competition for a given bid is removed.

While a distributor would prefer a lower cost by choosing the best low-cost mix of products, it cannot afford the penalty that will be imposed on it by KSA and Acuity unless it agrees to exclusivity. The incentive for distributors to acquiesce to KSA's demands further is increased by KSA's promise that the distributor will still get the same margins it has been getting, which means that any cost increase will be passed on to the ultimate consumers. Without the ability of Force Partners to provide a competitive check on KSA pricing, there is nothing to limit the ability of Acuity and the distributors to continue to increase prices in the future.

### C. KSA's Campaign to Lure Distributors into a Conspiracy to Remove Force Partners (and others) as a Competitor in the Market by Forcing a Group Boycott of Plaintiff's Business.

45. In August 2019, Jim Williams, the CEO of KSA, and his wife, Ashley Williams, the then-Vice President of Distributor Solutions at KSA, made a coordinated and near-simultaneous approach to most of the 24 most important lighting distributors in the greater Chicagoland market, using a PowerPoint presentation ("PowerPoint") in person to each distributor with the aim of getting them to stop doing business with Force Partners through a combination of monetary inducements and threats to withhold critical products and services.

46. The Williamses, a flashy and flamboyant couple who in 2016 were married at the Trump Hotel in Chicago, have made no secret of their close relationship to Vernon Nagel, the CEO of Acuity. And Mrs. Williams, who took the lead in many of the August 2019 meetings with distributors, was reported to be particularly aggressive in her role at KSA and adamant that lighting distributors stop doing business with Force Partners.

47. Using a PowerPoint that appeared to distributors to have been created by both Acuity and KSA, the Williamses presented a message that alarmed and concerned many of the lighting distributors.

48. The PowerPoint reportedly identified companies that KSA (and apparently Acuity) thought the distributors should boycott. In particular, the PowerPoint reportedly explicitly named Force Partners as an agency that distributors should boycott. KSA claimed that Force Partners was bypassing distributors to make sales directly to end-users and contractors, thereby denying sales and profits to distributors. This claim was false, and KSA knew or should have known it was false.

49. The PowerPoint also named Vertical Lighting & Controls, a sales agency that largely represents lower-cost brands, and companies connected to NEMRA (the National Electrical Manufacturers Representative Association) – lumping both under the rubric "China, Inc." The message presented aligned with Acuity's reported concerns that "Aggressive pricing actions by competitors, including Asian importers and those within the technology and services sectors, may affect the Company's ability to achieve desired revenue growth and profitability levels under its current pricing strategies."

50. Consistent with the message about price competition with "China, Inc." companies, the Williamses also told distributors that they were unhappy about KSA's falling margin from competition by Force Partners. One distributor reported that KSA said "Force Partners is going around town offering competitive and aggressive pricing to our contractors, and they must be stopped."

51. With this backdrop, KSA rolled out the boycott scheme with which it wanted the distributors to agree. If a distributor wanted to continue to receive KSA's "best prices" and services, it would have to agree to be a "Partner" of KSA. To be a "Partner," distributors would have to agree to sharply curtail their business with Force Partners.

52. Stock and flow distributors were told they could not carry *any* Force Partners' brands on their shelves. The biggest effect of such an agreement would be to take Eaton's Cooper Lighting products – a very significant competitor to Acuity – off of these distributors' shelves.

53. Project/specification distributors were told they had to rig bids to ensure that KSA won any multiple-name specification bids that also included Force Partners. Where KSA brands and Force Partners brands were specified for bidding on a project, the distributors were told they either had to not quote Force Partners at all or they would have to provide Force Partner's confidential pricing information to KSA so it could "match" the price. Only if Force Partners' brands were the only ones specified on a bid were the distributors permitted to quote their prices.

54. As Ashley Williams reportedly said to at least one distributor, they could no longer quote Force Partners on projects, unless it was "mutually agreed to with KSA."

55. Such a scheme is not in the interests of distributors or their customers. The spec community in the greater Chicagoland market tends to be brand-focused, and architects and designers often have preferred product lines specified in their plans. Chicago is uniquely known as a "line item" town where contractors submit requests for quotes to distributors seeking between 1-3 "approved" brand-specific quotes for 10-20 different product categories as needed (*e.g.*, linear recessed lighting, exit & emergency lighting, garage & canopy lighting, controls). After the distributor has obtained quotes from each of the specified brands via the manufacturer's sales representatives, the distributor can pick and choose between the brand/pricing options presented for line items. As described above, contractors also can specify or approve just one manufacturer's product line for all categories.

56. KSA's actions appear to be an attempt to revert the Chicago market back to a limited "sole source" distribution model, harming competition and consumer choice.

57. If the distributors did not agree to KSA's demands, they would be deemed "Associates" and would not be able to get KSA's brands' "best prices" or attendant services. This would effectively bar the distributors' ability competitively to quote KSA brands and they would lose business to those distributors who were willing to go along with the scheme.

58. Distributors reported to plaintiff that they were appalled and intimidated by KSA's demands. In particular, complaining distributors were dubious about the legality of the program, and felt that it was being driven in part by Acuity. Distributors also reported that Ashley Williams was identified as the point person from KSA in the presentations, and that the message was being delivered from Jim Williams.

59. Notably, KSA left no copies of the PowerPoints with the distributors and did not allow distributors to copy or photograph the PowerPoint — suggesting they feared putting their proposed boycott in writing; nor have they ever provided any contracts for distributors to sign. Instead, KSA said it would monitor compliance by, for example, inspecting shelves at stock and flow distributors. One distributor was told by KSA that they were "the only one in town" who had not agreed to KSA's scheme.

60. All of the distributors reported that they could not afford to lose access to KSA's products. Various distributors reported that KSA products represented anywhere from 40%-70% of their lighting sales. Others, however, observed that their customers would be angry if they could not get Force Partners brands.

61. In one of the meetings, which was attended by Acuity's Senior Vice President of Sales, John Mabbott, a distributor asked if KSA would indemnify them for losses, to which no response was provided.

62. Distributors prefer competition because it provides the lower costs and better service. However, many distributors have said they must go along with KSA's effective exclusivity demands because they rely more on KSA and its larger market share than Force Partners. The incentive for distributors to acquiesce to KSA's demands further is increased by KSA's reported claims that, at least for some time, distributors will still get the same margins they have been getting. The cost increases from reduced competition thus will largely be passed on to the ultimate consumers. Accordingly, KSA is in a position to monopolize the market and create antitrust harm.

63. Alarmed by the reports from distributors, Force Partners wrote to KSA on August 21, 2019 warning that its conduct was anticompetitive and violated the antitrust laws.

64. Within a week of that letter, KSA announced that Ashley Williams was leaving her Distributor Solutions job there.

65. Force Partners hoped this was a sign that KSA recognized that its scheme was illegal and would not press ahead. However, a few weeks later, it became clear that KSA was going to continue with its illegal plans.

66. In recent weeks, Jim Williams has followed up with all or virtually all of the distributors asking if they are going to participate in KSA's boycott scheme.

67. KSA also has notified stock and flow distributors that shelf inspections will be commencing to ensure none of Force Partners' brands are on their shelves.

68. Some distributors have asked if there will be any written contract memorializing the program, but KSA has refused to provide one. As one distributor put it, the offer from KSA was "no carrot, only stick."

69. In September, after months of upward sales momentum, Force Partners started to see a significant drop in sales and revenue. That downward trend has continued in October. Between September 1, 2019 and the filing of this complaint, Force Partners' sales have fallen by over 20%, which Force Partners believes is attributable to KSA's hub and spoke conspiracy with Acuity and the distributors.

**D. Anticompetitive Effects of KSA's and Acuity's Conduct**

70. The Defendants' conspiracy has had or will have the following anticompetitive effects, among others:

a. Increased prices.
b. Reduced choice and ability to select desired products by end-users.
c. Increased likelihood of bidding fraud.
d. Reduced choice for distributors.
e. Increased market power in the relevant market by KSA and Acuity due to lack of competition.

71. Plaintiff knows of no procompetitive effects of Defendants' conspiracy, which plainly is anticompetitive and injures competition. There was no business or competitive problem with the existing distribution network that justified the change demanded by Defendants other than a desire by Defendants to eliminate competition to increase their profits.

72. Even if Defendants allege that there are procompetitive benefits to their scheme, any benefits are substantially outweighed by the anticompetitive impact.

73. The actions of the Defendants in coercing each of the distributors to abide by their new requirements, and securing their agreement, creates a hub-and-spoke horizontal conspiracy which is illegal per se.

## CAUSES OF ACTION

### COUNT I
### Unreasonable Restraint of Trade
### (Illegal Group Boycott – Violation of § 1 of the Sherman Act)

74. Plaintiff restates and incorporates by references the allegations of paragraphs 1 through 72 of the Complaint as if fully set forth herein.

75. Through coercive demands and threats, the Defendants agreed between themselves to deny services, and effectively deny access to KSA brands to Chicago-area distributors unless those distributors terminated their relationship with and/or agreed to boycott Force Partners. The same or similar threats were parallel, made by Defendants to distributors at roughly the same time, and/or communicated to distributors within days of each other.

76. The Defendants had an anticompetitive motive to force a group boycott of Force Partners, with the intent to run Force Partners out of business.

77. Agreeing to the group boycott was not in the distributors' best economic interest because it denied distributors a full choice of nonfungible products and the option of purchasing from Force Partners rather than KSA. Moreover, the effect of the boycott will increase prices to distributors and to end users. However, the group boycott was forced upon distributors in light of KSA's market power.

78. Defendants' illegal group boycott was an unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

79. Defendants' conduct has damaged Force Partners in the form of lost revenues, lost profits, lost equity, and lost goodwill, as well as threatening the future viability of Force Partners as a going concern.

**COUNT II**
**Unreasonable Restraint of Trade**
**(Horizontal Conspiracy – Violation of § 1 of the Sherman Act)**

80. Plaintiff restates and incorporates by references the allegations of paragraphs 1 through 79 of the Complaint as if fully set forth herein.

81. Section One of the Sherman Act provides that "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal."

82. Beginning within the four years before the filing of this Complaint, and continuing to the present, Defendants engaged in a continuing contract, combination, or conspiracy to unreasonably restrain interstate trade or commerce in violation of § 1 of the Sherman Act, 15 U.S.C. § 1.

83. The conspiracy alleged herein consists of a continuing agreement among Defendants and its co-conspirators to effectively require distributors of electrical lighting equipment to deal exclusively with Defendants, ultimately resulting in higher prices and reduced output.

84. Because Defendants obtained agreements from the distributors, and because the Defendants' scheme was implemented pursuant to an agreement between Acuity and KSA, the scheme cannot be considered a unilateral refusal to deal.

85. The conspiracy to boycott Force Partners in the greater Chicagoland market is horizontal in nature, with Defendants acting as the hub of the scheme and the distributors who were coerced into the boycott as the spokes. A "hub and spoke" horizontal conspiracy may be inferred from the following:

a. Defendants cut off access to a supply, facility or market – the dominant greater Chicagoland market distributors – necessary for the plaintiff to compete;

b. Defendants possessed a dominant position in the market and used that position to coerce the distributors into boycotting Force Partners; and

c. The boycott cannot be justified by plausible arguments that it was designed to enhance overall efficiency.

86. This conspiracy is a per se violation under the federal antitrust laws, specifically 15 U.S.C. § 1.

87. In the alternative, Defendants' conspiracy is illegal as an unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 as a violation of the "rule of reason."

88. Defendants' conduct has damaged Force Partners in the form of lost revenues, lost profits, lost equity and lost goodwill, as well as threatening the future viability of Force Partners as a going concern.

89. Defendants' conduct harms competition and consumers in the relevant market by reducing price competition, output, and choices.

**COUNT III**
**(Attempted Monopolization – Violation of § 2 of the Sherman Act)**

90. Plaintiff restates and incorporates by references the allegations of paragraphs 1 through 89 of the Complaint as if fully set forth herein.

91. Defendants have engaged in an attempt to acquire monopoly power in the market described above and has used, and continues to use, anticompetitive means to achieve this end. Specifically:

a. The Defendants have demonstrated a specific intent to monopolize the market by announcing and implementing a scheme to eliminate competition from the market;

b. The Defendants' actions and statements have demonstrated an intent to control prices and destroy competition;

c. As part of the Defendants' attempted monopolization, the Defendants disseminated false information about the Plaintiff.

d. The elimination of competition in the market will constitute antitrust injury.

e. The Defendants' scheme was not a mere incentive plan intended to increase sales, but a program designed to eliminate competition, since it was intended to eliminate the ability of distributors to compete if they did not agree to the terms dictated by KSA and Acuity.

f. The Defendants implemented their scheme knowing that Plaintiff and others in the market would be foreclosed if the restrictive terms were followed.

g. The Defendants knowingly implemented a scheme whereby price information would not be shared with distributors and their customers, in order to conceal increased prices and limit the ability of distributors and their customers to compete.

h. The large market share represented by Defendants indicates a dangerous probability of success of their scheme.

i. The structure of the market and the nature of Defendants' scheme makes significant competitive entry into the market highly unlikely.

j. The totality of competitive circumstances (false statements, dominant market share, required exclusive dealing) indicate an intent to implement a scheme to monopolize the market.

92. Additionally, the Defendants' conduct indicates a conspiracy to monopolize:

a. The monopolistic distribution scheme was jointly implemented by Defendants through the use of shared printed materials and joint meetings with distributors.

b. The Defendants engaged in a conspiracy intended to produce an anticompetitive effect on the market as a whole.

c. The Defendants' conspiracy also was intended to, and did, injure Plaintiff.

d. There was no business need to implement the program, as the Defendant was successful in achieving distribution in the relevant market.

e. There was no procompetitive justification offered for the program.

93. Defendants' attempted monopolization of the greater Chicagoland market, and conspiracy to monopolize that market, violates Section 2 of the Sherman Act, 15 U.S.C. § 2.

94. Defendants' conduct has damaged Force Partners, and will continue to harm Force Partners, in the form of lost revenues, lost profits, lost equity and lost goodwill, as well as threatening the future viability of Force Partners as a going concern.

95. If successful, Defendants' have a dangerous probability of monopolizing the market, which will lessen or destroy competition in the relevant market by reducing price competition, output, and choices, and injuring consumers.

**COUNT IV**
**(Exclusive Dealing Agreements – Violation of § 3 of the Clayton Act)**

96. Plaintiff restates and incorporates by references the allegations of paragraphs 1 through 95 of the Complaint as if fully set forth herein.

97. The restrictive scheme imposed by the Defendants violates the Clayton Act as an illegal exclusive dealing agreement in the greater Chicagoland market, which already has had, and will have, the effect of substantially lessening competition or tending to create a monopoly in the market, for reasons including but not limited to the following:

a. Defendants have conditioned purchase of their product at commercially reasonable prices on exclusive dealing.

b. The Defendants' market share for the sale of lighting products in the greater Chicagoland market is in excess of 30 percent, making the exclusive dealing agreement presumptively unreasonable;

c. The exclusive dealing agreements foreclose Force Partners from a substantial market.

d. There is no procompetitive justification for excluding Force Partners from the market, which ultimately would raise prices if and when Force Partners is driven out of the market.

e. The restraint has a clear adverse effect on interbrand competition by denying competing companies access to the market.

f. The market previously has functioned efficiently, with a high degree of customer and end-user satisfaction without exclusivity requirements;

98. Defendants' conduct violates Section 3 of the Clayton Act, 15 U.S.C. § 14.

99. Defendants' conduct has damaged Force Partners in the form of lost revenues, lost profits, lost equity and lost goodwill, as well as threatening the future viability of Force Partners as a going concern.

100. Defendants' conduct harms competition and consumers in the relevant market by reducing price competition, output, and choices.

**COUNT V**
**(Violation of the Illinois Antitrust Act)**

101. Plaintiff restates and incorporates by references the allegations of paragraphs 1 through 100 of the Complaint as if fully set forth herein.

102. The Illinois Antitrust Act, § 740 ILCS 10/2, provides that "The purpose of this Act is to promote the unhampered growth of commerce and industry throughout the State by prohibiting restraints of trade which are secured through monopolistic or oligarchic practices and which act or tend to act to decrease competition between and among persons engaged in commerce and trade, whether in manufacturing, distribution, financing, and service industries or in related for-profit pursuits."

103. Defendants have created and maintained a combination and conspiracy for the purpose of controlling the prices charged for lighting products in the relevant market, specifically by limiting the sale or supply of the products, which is per se illegal under Illinois law, 740 ILCS 10/3 (1)(a) and (b).

104. Defendants' scheme attempts to allocate and divide customers and sales by seeking to control the process of bidding and limiting the ability of distributors to stock the products represented by Plaintiff, which is per se illegal under Illinois law, 740 ILCS 10/3 (1)(c).

105. The agreements between Defendants and the distributors unreasonably restrain trade or commerce within Illinois by limiting competition without any benefits to the market, which is illegal under Illinois law, 740 ILCS 10/3 (2).

106. Such actions by the Defendants are and were willful.

107. The Defendants have attempted to obtain monopoly power in the market by completely foreclosing the ability of competing manufacturers to sell products in the market. The Defendants' clearly articulated intent is to exclude competition and to control, fix, and maintain prices, in violation of Illinois law, 740 ILCS 10/3 (3). Such actions by the Defendants are and were willful.

108. The Defendants have refused to provide meaningful access to their products unless the purchasers agree to deal on exclusive terms with the Defendants, which substantially lessens competition and tends to create a monopoly in the relevant market, in violation of Illinois law, 740 ILCS 10/3 (4).

109. Defendants' conduct has damaged Force Partners in the form of lost revenues, lost profits, lost equity and lost goodwill, as well as threatening the future viability of Force Partners as a going concern.

110. Defendants' conduct harms competition and consumers in the relevant market by reducing price competition, output, and choices.

**COUNT VI**
**(Violation of the Illinois Uniform Deceptive Trade Practices Act)**

111. Plaintiff restates and incorporates by references the allegations of paragraphs 1 through 110 of the Complaint as if fully set forth herein.

112. Defendants violated the Illinois Uniform Deceptive Trade Practices Act, 815 Ill. Comp. Stat. 510/2, by disparaging the goods, services, or business of Force Partners by making false or misleading representations of fact, alleging that Force Partners was bypassing distributors to make direct sales to end-users.

113. Defendants have caused, and will continue to cause irreparable, ongoing harm to Force Partners if not enjoined from this deceptive trade practice.

**COUNT VII**
**(Tortious Interference with Prospective Business Relations)**

114. Force Partners re-alleges and incorporates by reference the allegations set forth in Paragraphs 1 through 113.

115. Force Partners had a reasonable expectation of entering into business relationships with the distributors in the relevant market.

116. KSA and Acuity knew that Force Partners expected to do business with the distributors and purposely interfered with Force Partners' opportunity to conduct such business

117. KSA and Acuity have tortiously interfered, and continue to interfere, with Force Partners' prospective business relations with distributors in the relevant market.

118. KSA and Acuity intended to induce and cause distributors who have done business with Force Partners in the past not to enter into prospective relations with Force Partners.

119. Force Partners was reasonably likely to continue prospective business relations with its distributors.

120. KSA and Acuity intentionally interfered, and continue to interfere, using improper and wrongful means including, but not limited to, engaging in anticompetitive conduct.

121. The actions of KSA and Acuity were undertaken with malice, as shown by the targeting of Force Partners and the use of false statements and unfair methods of competition to harm the business and business expectancy of Force Partners.

122. The actions of KSA and Acuity, constituting unfair competition and antitrust violations, were not protected by the privilege of competition.

123. As a result of KSA's and Acuity's actions, Force Partners is suffering, and will continue to suffer, reputational and financial harm in an amount to be proven at trial.

**PRAYER FOR RELIEF**

Plaintiff prays for the following relief:

1. A preliminary injunction enjoining Defendants from the unlawful conduct alleged herein.

2. A permanent injunction enjoining Defendants from the unlawful conduct alleged herein.

3. Compensatory and treble damages against all Defendants, jointly or severally, and punitive damages in an amount to be proven at trial.

4. Punitive damages where permissible by law.

5. Award plaintiff reasonable costs and expenses incurred in this action, including attorney's fees and expert fees; and

6. Any such further relief as the Court deems appropriate.

Respectfully submitted,

FORCE PARTNERS, LLC

/s/ Sarah R. Marmor
Sarah R. Marmor
Theodore A. Banks
George S. Sax
SCHARF BANKS MARMOR LLC
333 West Wacker Drive, Suite 450
Chicago, IL 60606
Ph. 312-726-6000
smarmor@scharfbanks.com
tbanks@scharfbanks.com
gsax@scharfbanks.com

*Counsel for Plaintiff Force Partners, LLC*