IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

FORCE PARTNERS, LLC,

        Plaintiff,

    v.

KSA LIGHTING & CONTROLS, INC.;
ACUITY BRANDS, INC.; JIM
WILLIAMS; and ASHLEY WILLIAMS,

        Defendants.

No. 19-cv-07776
Judge Franklin U. Valderrama

## MEMORANDUM OPINION AND ORDER

Plaintiff Force Partners, LLC (Force Partners), a sales agent in the lighting and controls business, filed this antitrust lawsuit[1] against four defendants: Force Partners' competitor, KSA Lighting & Controls, Inc. (KSA); KSA's President, Jim Williams (Jim); KSA's then-Vice President of Distributor Solutions, Ashley Williams (Ashley) (together with KSA and Jim, the KSA Defendants); and Acuity Brands, Inc. (Acuity) (collectively, with the KSA Defendants, Defendants), a lighting manufacturer, asserting violations of Sections 1 and 2 of the Sherman Act, Section 3 of the Clayton Act, the Illinois Antitrust Act (740 ILCS 10/1), the Illinois Uniform Deceptive Trade Practices Act (815 ILCS 510/2) (the IUDTPA), and tortious interference with prospective business relations. R. 41, FAC.[2] Before the Court are

---

[1]The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1137.

[2]Citations to the docket are indicated by "R." followed by the docket number or filing name, and where necessary, a page or paragraph citation.

Defendants' motions to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). R. 45, Acuity Mot. Dismiss; R. 47, KSA Mot. Dismiss.[3] For the reasons discussed below, the Court grants in part and denies in part Defendants' motions to dismiss.

## Background

### I. Lighting and Control Business

Force Partners and KSA are sales representatives who compete in the lighting and control business. FAC ¶¶ 26–27.[4] Force Partners and KSA each act as the exclusive sales representative for particular lighting and controls manufacturers in the greater Chicagoland area. *Id.* ¶ 26. KSA is an exclusive sales representative for Acuity, the largest manufacturer of lighting products in North America. *Id.* ¶ 32. Force Partners' and KSA's customers are distributors who purchase lighting and control products for both commercial and industrial projects and for their own shelves to sell to end users. *Id.* ¶ 2. In order to best meet the needs of customers, lighting

---

[3]The KSA Defendants and Acuity filed separate motions to dismiss, but raise some overlapping arguments in support of dismissal. Acuity Mot. Dismiss; KSA Mot. Dismiss. To the extent Defendants raise similar arguments, the Court addresses those arguments—and Force Partners' responses—together. If only one motion to dismiss raises a certain argument, the Court so notes in the Opinion.

The Court notes that a significant portion of Acuity's motion to dismiss and reply briefs is contained in footnotes. Arguments in footnotes are typically waived. *See Sanders v. JGWPT Holdings, Inc.*, 2016 WL 4009941, at *10 (N.D. Ill. July 26, 2016). Moreover, the Court's Standing Order, under "Memorandum of Law Requirements," states that "[g]enerally, the Court will not consider substantive arguments contained in footnotes." However, Acuity filed its briefs before this case was reassigned to this Court, so the Court will consider the arguments raised in footnotes in Acuity's briefs. And yes, the Court recognizes the irony of including this admonishment in a footnote, but given that it is merely a reminder to the parties for future briefs filed before this Court, and is unrelated to the substance of the Opinion, the Court finds it appropriate to note in this manner.

[4]The Court accepts as true all of the well-pleaded facts in the FAC and draws all reasonable inferences in favor of Force Partners. *Platt v. Brown*, 872 F.3d 848, 851 (7th Cir. 2017).

product distributors carry the products of a variety of manufacturers in their inventory and also source products on a custom basis for "spec" commercial and industrial projects. *Id.* ¶ 9. While the distributors directly purchase the lighting products and controls from the manufacturers and the manufacturers' exclusive sales representative, contractors and end-users are the indirect purchasers of the products. *Id.* ¶ 49.

The lighting and controls sold by "full line" sales representatives like Force Partners and KSA include, among other products, exit and emergency lights and signs, sports lighting, and wired and wireless controls. FAC ¶ 28. Force Partners alleges that the relevant product market in this case is lighting and controls for buildings and private roadways. *Id.*

## II. Geographic Market

Lighting and controls manufacturers, like Acuity, contract with exclusive sales representatives, like Force Partners and KSA, to cover a defined geographic territory. FAC ¶ 29. A manufacturer's designated sales representative is the only authorized marketer of the designated brands in the specified area to downstream channels. *Id.* Sales representative agencies have agreements that define their territories. *Id.* ¶ 30. The relevant geographic market in this case is comprised of sixteen Illinois counties in Northern Illinois and surrounding Chicago, including three counties in Northwest Indiana (the Market). *Id.* ¶ 30. Sales representatives may represent more than one manufacturer's products in the same geographic territory. *Id.* ¶ 31. However, manufacturers assign exclusive territories to just one sales representative. *Id.* ¶ 34.

Assigning exclusive territories to sales representatives enables manufacturers to build and maintain brand sales through relationships with local distributors, contractors, builders, and designers in the territory. FAC ¶ 34. These exclusive contracts mean it is not easy to obtain a manufacturer's products other than through its exclusive sales representative. *Id.* In the relevant Market, over 75% of the trade is handled by approximately 23 distributors, which in turn comprise approximately 90% of Force Partners and KSA's customers. *Id.* ¶ 37.

For example, architects, lighting designers, and engineers develop specifications for construction projects, and interact with sales representatives who want their products specified for an upcoming project installation. FAC ¶ 47. Architects and lighting designers usually list up to three acceptable alternative manufacturers for each fixture type. *Id.* Sometimes these specifications list only one manufacturer's name, which indicates a "hard spec" with no substitution; other specifications list as many as three manufacturers' names, which means any one of them is pre-approved and acceptable and invites competition to supply the specified products. *Id.* Finally, some specifications reference a single manufacturer but state "or equal," meaning another manufacturer can be asked to compete and provide a quote so long is it meets the technical requirements of the design. *Id.*

Sales representatives sell downstream through a few primary channels; namely, stock and flow distributors and project/specification distributors. FAC ¶ 35. Stock and flow distributors carry and sell inventory of a variety of brands in a physical showroom, counter area, or warehouse that serves the "on-demand" needs of

small to mid-sized electrical contractors and a limited number of retail customers and homeowners. *Id.* Project/specification distributors supply larger building projects and provide materials management services to coordinate or direct goods to local staging areas at the time that builders/contractors need the supplies. *Id.* Some distributors deal in both stock and flow and project/specification work. *Id.*

Once distributors receive specifications for projects, they are expected to seek bids from approved manufacturers' representatives. FAC ¶ 49. Once the bids are presented, the distributor is expected to submit the most complete package at the best price that can be delivered in a timely manner. *Id.* Sales representatives can provide budget quotes directly to contractors, but these quotes will include extra margin for the distributor. *Id.* ¶ 36. Such quotes do not and cannot cut distributors out of the sale because the distributors offer a consolidation point along with financing, with terms that go back to the contractors. *Id.*

Force Partners alleges that distributors in the lighting market and their end users benefit in numerous ways from competition among sales representatives like Force Partners and KSA. FAC ¶ 50. These include the ability to identify the best price and service options for their clients among available manufacturers, who expect distributors to offer complete solutions for their lighting and control needs. *Id.*

### III.   Market Power

Between 2017 and August 2019, KSA and Force Partners were the top two largest sales representatives supplying lighting and control products in the Market, representing approximately 59.5% and 23%, respectively, of specified and approved

products in the project/specification market. FAC ¶ 43. The other two sales representatives in the Market, PG enlighten and CLW, represented approximately 10% and 7.5% of product. *Id.*

### IV. Power Point Presentation

In August 2019, Jim and his wife, Ashley, gave a PowerPoint presentation (the Presentation) to all or most of the 23 most important lighting distributors in the Market. FAC ¶ 73. Force Partners alleges that the goal of the Presentation was to stop the distributors from doing business with Force Partners through a combination of monetary inducements and threats to withhold critical products and services. *Id.* The Presentation explicitly named Force Partners as a sales representative that the distributors should boycott. *Id.* ¶ 77. Force Partners alleges that Defendants falsely accused Force Partners of bypassing distributors to make sales directly to end-users and contractors, thereby denying sales and profits to distributors. *Id.*

KSA subsequently rolled out a program by which, if a distributor wanted to continue to receive KSA's "best prices" and "services," it would have to agree to be a "Partner" of KSA (the Proposal). FAC ¶ 82. Stock and flow distributors were told that they could not carry any of Force Partners' brands on their shelves. *Id.* ¶ 83. The biggest effect of such an agreement would be to take Eaton's Cooper Lighting products, an Acuity competitor, off these distributors' shelves and significantly reduce access to the Chicago market. *Id.* Project/specification distributors were told that they had to rig bids to ensure that KSA won any multiple-name specification bids that also included Force Partner. *Id.* ¶ 84. Where KSA brands and Force

Partners brands were specified for bidding on a project, the distributors were given the choice of: (a) not quoting Force Partners brands at all, or (b) providing Force Partners' confidential pricing information to KSA so it could "match" the price. *Id.* Force Partners claims that the goal of the Proposal's terms was to take away business away from Force Partners and drive it out of business. *Id.*

If the distributors did not agree to the Proposal, they would be deemed "Associates" and would not be able to get KSA's brands "best prices" or attendant services. FAC ¶ 90. This would effectively bar the distributors' ability to competitively quote KSA brands and they would lose business to those distributors who were willing to go along with the scheme. *Id.* Distributors informed Force Partners that they were intimidated by KSA's demands. *Id.* ¶ 94.

KSA left no copies of the Presentation with the distributors and did not allow distributors to copy or photograph the Presentation. FAC ¶ 95. Nor has KSA ever provided the distributors with any contracts to sign. *Id.* KSA said it would monitor compliance by inspecting shelves at stock and flow distributors. *Id.* ¶ 97.

Acuity supported the Proposal. FAC ¶ 100. In August or September 2019, Jim reported at a KSA sales meeting that Acuity's then-CEO had reviewed the Proposal presented in the Presentation, approved it, and suggested it could be used in other markets. *Id.* At the request of a distributor, Acuity's senior vice president of sales attended the meeting with the distributor, during which he made it clear the Proposal had Acuity's backing. *Id.* ¶ 101.

According to Force Partners, the Proposal is not in the interests of distributors or their customers. FAC ¶ 88. The specification community in the Market tends to be brand-focused, and architects and designers often have preferred product lines specified in their plans. *Id.* Chicago is known as a "line item" town where contractors submit requests for quotes to distributors seeking between one-to-three "approved" brand-specific quotes for ten-to-twenty different product categories as needed. *Id.* After a distributor has obtained quotes from each of the specified brands via the manufacturer's sales representatives, the distributor can choose between the brand and pricing options to provide the best value to the end-user or contractor. *Id.*

After KSA initiated the Proposal, Force Partners saw over a 20% decline in its sales. FAC ¶ 110. As of the filing of the First Amended Complaint (FAC), Force Partners suffered significant lost revenues. *Id.* ¶ 111.

Force Partners filed suit against the KSA Defendants and Acuity. In its FAC, Force Partners asserts an illegal group boycott in violation of Section 1 of the Sherman Act (Count I); horizontal conspiracy in violation of Section 1 of the Sherman Act (Count II); attempted monopolization in violation of Section 2 of the Sherman Act (Count III); exclusive dealing agreements in violation of Section 3 of the Clayton Act (Count IV); violation of the Illinois Antitrust Act (Count V); violation of the IUDTPA (Count VI); and a claim for tortious interference with prospective business relations (Count VII).[5] *See* FAC. Defendants now move to dismiss the FAC pursuant to Rule 12(b)(6).

---

[5]Force Partners mislabeled Count VII as Count VI.

## Standard of Review

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint. *Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). Under Rule 8(a)(2), a complaint must include only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). To survive a motion to dismiss, a complaint need only contain factual allegations, accepted as true, sufficient to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. The allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. The allegations that are entitled to the assumption of truth are those that are factual, rather than mere legal conclusions. *Iqbal*, 556 U.S. at 678–79.

## Analysis

### I.     Section 1 of the Sherman Act (Counts I and II)

In Counts I and II, respectively, Force Partners asserts that Defendants forced a group boycott and engaged in a horizontal conspiracy that constituted an unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C § 1. FAC ¶ 122.

Section 1 of the Sherman Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce . . . is

declared to be illegal." 15 U.S.C. § 1. Section 1 does not prohibit reasonable restraints of trade, but only outlaws *unreasonable* restraints of trade. *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1977). To state a Section 1 claim, a plaintiff must allege: (1) a combination or some form of concerted action between at least two legally distinct entities that (2) unreasonably restrains trade in the relevant market, and (3) an accompanying injury. *See In re Delta Dental Antitrust Litig.*, 484 F. Supp. 3d 627, 632–33, 643 (N.D. Ill. 2020) (citing *Denny's Marina, Inc. v. Renfro Prods., Inc.,* 8 F.3d 1217, 1220 (7th Cir. 1993)); *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 191 (2010).

Courts engage in three types of analyses to determine whether the alleged conduct has anticompetitive effects under Section 1: the *per se* analysis, the rule of reason, and the quick-look approach. *In re Delta Dental Antitrust Litig.*, 484 F. Supp. 3d at 633.

### A. *Per Se* Violations

The Supreme Court has explained that restraints on trade that are "unlawful *per se*" are those that "have such predictable and pernicious anticompetitive effect, and such limited potential for procompetitive benefit," that it is obvious they are an unreasonable restraint of trade. *Khan*, 522 U.S. at 10. The *per se* rule applies to restraints "that would always or almost always tend to restrict competition and decrease output." *Leegin Creative Leather Prods., Inc., v. PSKS, Inc.*, 551 U.S. 877, 886 (2007) (internal citation omitted). The *per se* rule is reserved for restraints with which courts have had considerable experience, such that they can predict with

confidence that the restraint would be invalidated in all or almost all instances under the rule of reason. *Id.* at 886–87.

Where the alleged "anticompetitive conduct does not amount to a *per se* violation of the Sherman Act, courts assess the defendants' conduct under the Rule of Reason analysis." *Neptun Light, Inc. v. City of Chi.*, 2018 WL 1794769, at *3 (N.D. Ill. Apr. 16, 2018) (internal citations omitted).

### B. Rule of Reason

Under the rule of reason, the factfinder "must decide whether the questioned practice imposes an unreasonable restraint on competition, taking into account a variety of factors, including specific information about the relevant business, its condition before and after the restraint was imposed, and the restraint's history, nature, and effect." *Khan*, 522 U.S. at 10 (internal citations omitted). Generally, this requires a plaintiff to show the "defendant has market power—that is, the ability to raise prices significantly without going out of business—without which the defendant could not cause anticompetitive effects on market pricing."[6] *Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 335 (7th Cir. 2012) (internal citation omitted).

---

[6]The third test courts sometimes apply is the "quick look" analysis. As the Seventh Circuit has explained, "the quick-look approach can be used when 'an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets,' but there are nonetheless reasons to examine the potential procompetitive justifications." *Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 336 (7th Cir. 2012). Under the quick-look analysis, if the defendant lacks legitimate justification for facially anticompetitive behavior, then the court condemns the practice without ado without resort to analysis of market power. *Id.* Force Partners does not argue that the Court apply the quick-look analysis here, so the Court does not address it substantively. *See* FAC.

## C. Horizontal and Vertical Conspiracies

Agreements within the scope of Section I of the Sherman Act may be "horizontal" which are "between competitors at the same level of market structure," or "vertical" which are "combinations of persons at different levels of the market structure, e.g., manufactures and distributors." *Unites States v. Topco Assocs., Inc.*, 405 U.S. 596, 608 (1972). "Horizontal agreements among competitors, including group boycotts, [are] illegal per se." *Toys "R" Us, Inc. v. F.T.C.*, 221 F.3d 928, 936 (7th Cir. 2000). On the other hand, most vertical agreements are analyzed under the rule of reason. *See Hennessy Indus. Inc. v. FMC Corp.*, 779 F.2d 402, 404 (7th Cir. 1985) ("Only those vertical arrangements that accompany or implement a price fixing scheme are considered *per se* violations; other vertical arrangements must be tested under the Rule of Reason.") (internal citation omitted); *see also Republic Tobacco Co. v. N. Atl. Trading Co.*, 381 F.3d 717, 736 (7th Cir. 2004) ("Unlike horizontal agreements between competitors, vertical exclusive distributorships . . . are presumptively legal.").

A hybrid of a vertical and horizontal conspiracy is known as a "hub-and-spoke conspiracy," in which the "hub" stands in a vertical relationship with the "spokes," which are in a horizontal relationship with each other. *See In re Sulfuric Acid Antitrust Litig.,* 743 F. Supp. 2d 827, 860 (N.D. Ill. 2010). More specifically, a "hub-and-spokes conspiracy "requires a plaintiff to allege both that there was a central coordinating party (the 'hub'), and that each participant (along the 'rim') recognized that it was part of the greater arrangement, and it coordinated or otherwise carried

12

out its duties as part of the broader group." *Marion Healthcare, LLC v. Becton Dickinson & Co.*, 952 F.3d 832 (7th Cir. 2020). As the Seventh Circuit has explained, "a hub-and-spokes conspiracy requires a 'rim' connecting the various horizontal agreements." *Id.*

### D. Theories of Counts I and II and Bases of Defendants' Motions to Dismiss

Defendants argue that Force Partners fails to state an unreasonable restraint on trade in violation of Section 1 of the Sherman Act in Counts I and II. R. 46, Acuity Memo. Dismiss at 4–12; R. 48, KSA Memo. Dismiss at 6–15. It appears, based on their motions to dismiss, that Defendants interpret the theories underlying Counts I and II differently. On the one hand, the KSA Defendants distinguish between the two Counts based primarily on the parties to the alleged conspiracy—Count I alleges a conspiracy among all Defendants, whereas Count II alleges a conspiracy between Defendants and the distributors. *See* KSA Memo. Dismiss at 8–13. On the other hand, Acuity argues that all three antitrust claims (Counts I–III) should be dismissed because the "exclusivity" agreements between Defendants and distributors do not harm competition; Acuity does not challenge any allegations of a conspiracy among Defendants only. Acuity Memo. Dismiss at 4–12.

The Court, having closely examined the FAC's allegations and Force Partners' responses, is somewhat perplexed by the theories underlying Counts I and II, which seem to be two sides of the same coin. In its Response to the KSA Defendants' motion to dismiss, Force Partners clarifies that "Count I, alleging an illegal boycott under the Sherman Act, and Count II, alleging a horizontal hub-and-spoke conspiracy under

the Act, 15 U.S.C. § 1, are appropriately pleaded and state causes of action against the KSA Defendants under the same analytical and factual framework." R. 57, Pl. KSA Resp. at 10. This explanation tracks the titles of Count I (Unreasonable Restraint of Trade, Illegal Group Boycott – Violation of § 1 of the Sherman Act) and Count II (Unreasonable Restraint of Trade, Horizontal Conspiracy – Violation of § 1 of the Sherman Act). FAC at 26–27. But Force Partners also states in its Response that "Count I alleges that the Defendants jointly coerced distributors into entering into a group boycott *as part of a hub and spoke conspiracy*" and that "Count II alleges [] a hub and spoke conspiracy." Pl. KSA Resp. at 10 (emphasis added). And the horizontal hub-and-spoke conspiracy alleged in Count II is supported by allegations relating to Defendants' conspiracy to coerce distributors to boycott Force Partners. FAC ¶¶ 128–30. Based on the above, the Court finds Counts I and II to be legally indistinguishable. For purposes of this Opinion, the Court considers Count I to allege a vertical conspiracy based on an agreement among the Defendants, as well as between Defendants and the distributors, but *not* to allege a horizontal hub-and-spoke conspiracy. It considers Count II to allege a horizontal hub-and-spoke conspiracy based on the conspiracy underlying Count I.

Force Partners alleges that both counts are *per se* violations of the antitrust laws, or alternatively violate the rule of reason. FAC ¶¶ 122–23, 131–32. As Force Partners concedes, because Defendants are a manufacturer and sales representative, and the boycott of Force Partners was effectuated by distributors, the FAC pleads the horizontal nature of the conspiracy via the hub-and-spoke model. Pl. KSA Resp. at

14

11. As stated above, the *per se* rule applies to horizontal group boycotts, but generally the rule of reason applies to vertical group boycotts with no horizontal component. *See MM Steel, L.P. v. JSW Steel (USA) Inc.*, 806 F.3d 835, 849–50 (5th Cir. 2015) (collecting cases); *see also Republic Tobacco*, 381 F.3d at 736 ("[V]ertical exclusive distributorships . . . are presumptively legal."). The Court therefore applies the rule of reason to Count I (because without the hub-and-spoke conspiracy hook, it can only be a vertical conspiracy) and the *per se* rule to Count II.

Having parsed out the claims at issue, the Court turns to Defendants' arguments in support of dismissal of Counts I and II. The KSA Defendants argue that: (1) Count I should be dismissed because Defendants are incapable of conspiring with each other; (2) Count I also should be dismissed because Force Partners does not allege an actionable anticompetitive agreement between the KSA Defendants and Acuity; (3) Count II should be dismissed because Force Partners does not allege an anticompetitive agreement between Defendants and the distributors; and (4) Counts I and II should be dismissed because Force Partners fails to plead that the alleged agreements caused a restraint of trade within the relevant product and geographic markets. KSA Memo. Dismiss at 6–15. Acuity does not raise the arguments relating to Defendants' ability to conspire with each other, nor does it analyze whether Force Partners alleges an actionable anticompetitive agreement between the KSA Defendants and Acuity. *See* Acuity Memo. Dismiss. Instead, Acuity focuses on the agreement between Defendants and the distributors, arguing that Counts I and II fail because: (1) Force Partners fails to rebut the presumption that exclusivity

agreements are a legitimate form of competition; (2) the agreements are not exclusive; (3) the KSA Defendants' Proposal does not harm the competitive process; and (4) because the agreements are terminable at will, they do not prevent Force Partners from offering distributors a better deal. *Id.* at 4–12. The Court addresses each argument in turn, examining the two motions' arguments together wherever possible.

### E. Defendants' Ability to Conspire with Each Other (Count I, KSA Defendants)

The KSA Defendants contend that Count I fails because the alleged co-conspirators, Jim, Ashley, KSA, and Acuity, are closely related individuals and entities that cannot legally conspire with each other. KSA Memo. Dismiss at 7 (citing *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 769 (1984)). Force Partners concedes that Jim and Ashley—the President/CEO and then-Vice President of Distribution of KSA, respectively—could not conspire with KSA, as it is "their own company." R. 57, Pl. KSA Resp. at 17; *see Copperweld*, 467 U.S. at 769 (a corporation cannot conspire with its own officers and employees). However, Force Partners maintains that the KSA Defendants together could—and did—conspire with Acuity. Pl. KSA Resp. at 15–18.

The KSA Defendants argue that they could not have conspired with Acuity because KSA is Acuity's closely related sales representative, and Defendants share the same economic interest: selling as many of Acuity's products as possible. KSA Memo. Dismiss at 7–8. In support, the KSA Defendants cite to a number of out-of-Circuit decisions. *Id.* (citing *F.B. Leopold Co. v. Roberts Filter Mfg. Co.*, 882 F. Supp. 433, 446–47 (W.D. Pa. 1995), *aff'd*, 119 F.3d 15 (Fed. Cir. 1997); *Pink Supply Corp. v.*

16

*Hiebert*, 788 F.2d 1313, 1316–17 (8th Cir. 1986); *Card v. Nat'l Life Ins. Co.*, 603 F.2d 828, 834 (10th Cir. 1979); *Boyce v. Penn Fishing Tackle Mfg.*, 1997 U.S. Dist. LEXIS 23293, at *14 (D.N.J. Sep. 8, 1997); *The Sample Inc. v. Pendleton Woolen Mills, Inc.*, 704 F. Supp. 498, 502 (S.D.N.Y. 1989)).

The KSA Defendants are correct that these cases, relying on *Copperweld*, stand for the proposition that separate legal entities and individuals cannot conspire with each other for purposes of § 1 of the Sherman Act where they are "so closely intertwined in economic interest and purpose with [each other] as to amount to a unified economic consciousness incapable of conspiring with itself." *Pink Supply*, 788 F.2d at 1317. However, the Court agrees with Force Partners that the cases cited by the KSA Defendants are distinguishable and that, based on the allegations in the FAC, the Court cannot, at the motion to dismiss stage, find that that KSA and Acuity are so closely intertwined that they amount to a unified economic consciousness. Pl. KSA Resp. at 15–17. First, Force Partners accurately points out that each case cited by the KSA Defendants in support of dismissal was decided at the summary judgment stage, not at the motion to dismiss stage. *Id.* at 15. Next, Force Partners is also correct that courts generally engage in a fact-intensive analysis about whether the manufacturers and sales representatives were functionally distinguishable. *Id.* at 15–16 (citing *Pink Supply*, 788 F.2d at 1316–17 (discovery showed that the defendant sales representatives' role was only to generate sales for the defendant manufacturer and they had no discretion over prices or terms or orders, and "[t]he representatives therefore did not constitute an independent step in the . . . distribution process")); *see*

17

*also The Sample*, 704 F. Supp. at 502 (same). As Force Partners argues in its Response, here, the FAC alleges that sales representatives like KSA "can provide budget quotes directly to contractors," salespeople for representatives "focus on calling on the contractors to influence which manufacturers they will select for projects, and rely in such efforts on the sale representative's value-add services and their relationships with the contractors," and lighting sales representatives "have been described as 'a separate breed of rep given their influence over how specifications are written in many geographic markets." Pl. KSA Resp. at 16–17 (citing FAC ¶¶ 36, 45). Additionally, unlike the cases cited by the KSA Defendants, the alleged conspiracy in this case originated with the sales representative (KSA), rather than with the manufacturer (Acuity). *Id.* at 17 (citing FAC ¶¶ 73–75, 100). Given the above, as well as the allegation that KSA represents more than one manufacturer, the Court cannot find, at the motion to dismiss stage, that the KSA Defendants and Acuity's actions uniformly served the same economic interest. The Court finds that the FAC adequately alleges a Section 1 conspiracy among the KSA Defendants and Acuity.

In their Reply,[7] the KSA Defendants argue that Jim and Ashley should be dismissed as defendants because Force Partners does not identify any party that they conspired with, apart from KSA, which Force Partners concedes cannot form the basis

---

[7]Although the Court would usually decline to consider an argument or case asserted for the first time in a reply, *see Narducci v. Moore*, 572 F.3d 313, 323 (7th Cir. 2009), the Court touches on it briefly because Force Partners argued in its Response that Jim and Ashley are individually liable because they conspired with Acuity, based on their relationship with Acuity's then-CEO. Resp. at 17 (citing FAC ¶ 74).

18

of a Section 1 conspiracy. R. 59, KSA Reply at 4. The Court agrees with Force Partners that it has adequately alleged that Jim and Ashley are individually liable under Section 1: the FAC alleges that Jim and Ashley were personally involved in the alleged scheme, not only through their executive positions at KSA, but also by personally making the Presentation in person to each distributor (and that an Acuity representative attended at least one meeting at which the Presentation was given). *See* FAC ¶¶ 73–74, 87, 101, 106); *see Omni Healthcare, Inc. v. Health First, Inc.*, 2015 WL 275806, at *15 (M.D. Fla. Jan. 22, 2015) (the plaintiffs adequately alleged individual defendants' "active participation in the anticompetitive scheme, not merely by using their executive positions . . . to authorize and approve the scheme, but also by personally attempting to coerce physicians and practice groups" to "join in a co-conspiring practice. . . . Those allegations suffice for individual antitrust liability") (citing *United States v. Wise*, 370 U.S. 405, 416 (1962)). Accordingly, the Court finds that Force Partners has sufficiently alleged that each defendant is a co-conspirator for purposes of Count I.

## F. Actionable Agreement Between Defendants (Count I, KSA Defendants)

The KSA Defendants next argue that Count I should be dismissed because it does not allege an actionable agreement between the KSA Defendants and Acuity. The KSA Defendants raise three arguments: (1) Force Partners pleads no facts plausibly suggesting that the KSA Defendants and Acuity entered into any agreement for an unlawful purpose; (2) the allegation that KSA would "deny access" to its brands to distributors "unless those distributors terminated their relationship"

with Force Partners is false; and (3) KSA has the right to unilaterally offer an authorized distributor program and to stop dealing with any distributors that do not wish to join the program. KSA Memo. Dismiss at 9–10.

Starting with the KSA Defendants' second argument, the Court agrees with Force Partners that it is improper, at the motion to dismiss stage, for the KSA Defendants to seek dismissal on the basis that Force Partners' allegation that KSA would deny access to its brands is "false." Pl. KSA Resp. at 21 (citing KSA Memo. Dismiss at 10). As noted above, when evaluating a motion to dismiss, the Court must accept the allegations in the complaint as true. *Iqbal*, 556 U.S. at 678.

Turning to the KSA Defendants' first argument, the Court again agrees with Force Partners. Force Partners alleges an agreement[8] between Defendants—that they jointly created the Presentation and the related scheme that was presented to the distributors in August of 2019, which sought to cut off access to a market necessary for Force Partners to be able to do business. Pl. KSA Resp. at 11 (citing FAC ¶¶ 75, 77, 82–101). Put another way, Force Partners claims that Defendants' Proposal is unlawful because its purpose was to drive Force Partners, a KSA competitor, out of business by coercing the distributors to boycott Force Partners. *Id.* The KSA Defendants argue that Force Partners' allegations simply demonstrate that the KSA Defendants were trying to compete for, and win, Force Partners' customers

---

[8]The KSA Defendants do not argue that the FAC fails to allege that an agreement existed between Defendants; rather, they contend that the purpose of any such agreement was not unlawful. KSA Memo. Dismiss at 9–10. Nonetheless, Force Partners is correct that an agreement need not be explicit to support a Section 1 claim. Pl. KSA Resp. at 18 (citing, among other cases, *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984)).

(distributors), by offering an authorized distributor program to the distributors. KSA Memo. Dismiss at 9–10. Rather than constituting anticompetitive behavior, the KSA Defendants contend that such a program actually enhances competition by cutting prices. *Id.* (citing *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1061 (8th Cir. 2000)); KSA Reply at 2 (citing *Speakers of Sport, Inc. v. ProServ, Inc.*, 178 F.3d 862, 865 (7th Cir. 1999)).

True, the Sherman Act does not prohibit, and in fact encourages, competition that results in "productive efficiencies, higher output, and lower prices." *Viamedia, Inc. v. Comcast Corp.*, 218 F. Supp. 3d 674, 689 (N.D. Ill. 2016), *rev'd on other grounds*, 951 F.3d 429 (7th Cir. 2020). In responding to the KSA Defendants' third argument, Force Partners contends that the KSA Defendants again ignore the allegations in the FAC, which show that Defendants intended to—and indeed did—coerce distributors to join the KSA Defendants' program, thereby shutting Force Partners out of the relevant geographic and product markets, which has the ultimate effect of increasing prices. Pl. KSA Resp. at 19–20 (citing FAC ¶¶ 94, 98–101, 107–109). Reading the allegations in the light most favorable to Force Partners, as it must, the Court finds that Force Partners has adequately alleged an actionable agreement among Defendants that suggests anticompetitive behavior harming Force Partners and the market.

## G. Actionable Agreements Between Defendants and Distributors (Count I, KSA Defendants)

For the reasons discussed above, the Court reads Count I as alleging a conspiracy not only among Defendants but also between Defendants and the

21

distributors. *See supra* Section I.C. Therefore, the Court addresses KSA Defendants' arguments as to the agreement between Defendants and the distributors as pertaining to Count I rather than Count II. The KSA Defendants argue this agreement is not actionable because: (1) Force Partners cannot allege that the incentive program from KSA has been implemented and the FAC alleges that no written contract has been offered to any distributor; and (2) KSA's *unilateral invitation* to join its authorized distributor program is neither an agreement nor an antitrust violation. KSA Memo. Dismiss at 11–12.[9]

The KSA Defendants first argue that the FAC alleges only in a conclusory manner that agreements existed between KSA and the distributors, which the KSA Defendants contest is insufficient. KSA Memo. Dismiss at 11 (citing *Twombly*, 550 U.S. at 556). In response, Force Partners points to multiple paragraphs of the FAC alleging that the program has been implemented among the distributors, as well as the general timeline. Pl. KSA Resp. at 21–22 (citing FAC ¶¶ 12, 37–40, 46–47, 49, 73, 82–84, 97–99, 106–112, 129, 145, 147, 152). Although the KSA Defendants retort in their Reply that these allegations, at most, "describe KSA unilaterally attempting to persuade distributors to participate in its incentive program," the Court disagrees. KSA Reply at 7. In particular, Force Partners' allegation that Jim told one distributor that it was the "only one in town who had not agreed to KSA's scheme" is sufficient at the motion to dismiss stage to plausibly plead the existence of an agreement

---

[9]Acuity's arguments about the validity of the alleged agreement all relate to its exclusivity, which the Court addresses below, *see supra* Section II, as such arguments more properly align with Force Partners' Sherman Act Section 2 claim.

between Defendants and the distributors. FAC ¶ 107; *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 629 (7th Cir. 2010) (finding that circumstantial evidence of an agreement can support an antitrust conspiracy and holding that at the motion to dismiss stage, the test whether to dismiss turns on the complaint's "plausibility").

### H. Restraint on Competition in the Market – Rule of Reason (Count I, All Defendants)

Defendants contend that Force Partners fails to plausibly allege that the agreements had an "anticompetitive effect on a given market within a geographic area," as required under the rule of reason (which, as discussed above, the Court is applying to Count I). KSA Memo. Dismiss at 13–14 (quoting *Agnew*, 683 F.3d at 335); R. 58, Acuity Reply at 4–5.[10] Specifically, the KSA Defendants argue that Force Partners' Section 1 claim fails under the rule of reason because Force Partners does not sufficiently allege a legally sufficient antitrust market, nor does it plead that the distributor program forecloses competition. KSA Memo. Dismiss at 14. The Court finds that, at this stage, the Force Partners has done enough in the FAC.

As an initial matter, for the reasons discussed below as to Force Partners' Section 2 claim, the Court finds that Force Partners has adequately alleged a sufficient relevant antitrust market. *See infra* Section II.

---

[10]As Force Partners notes in response to Acuity's motion to dismiss, Acuity did not dispute that the market at issue plausibly was alleged, nor did it challenge the claims of market dominance and market power. Pl. Acuity Resp. at 4 n.1. A party waives an argument when it raises it for the first time on reply. *See Narducci*, 572 F.3d at 323. However, because the KSA Defendants raised these arguments in their opening motion to dismiss, the Court substantively addresses them.

The Court therefore turns to the anticompetitive effect component. Force Partners contends that it alleges that the result of Defendants' program was to foreclose access to the most important distributors in the market. R. 56, Pl. Acuity Resp. at 11; *see also* FAC ¶ 73. That, submits Force Partners, is sufficient to establish an anticompetitive effect, as no rule requires the foreclosure to be complete in order to constitute an antitrust injury. *Id.* 10–11 (citing, among other cases, *Roland*, 749 F.2d at 392 (under Clayton Act, a plaintiff need only show "that the agreement was likely to have a substantial though not necessarily immediate anticompetitive effect"); *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 191 (3d Cir. 2005) (ensuring that "key dealers" offer only the defendant's products has a "significant" effect in preserving defendant's Section 2 monopoly, and serves as a "solid pillar of harm to competition"); *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 271–72, 285 (3d Cir. 2012) (coercive behavior by a dominant firm can support antitrust claim, especially where the firm "may use its power to break the competitive mechanism and deprive customers of the ability to make a meaningful choice"); *Gulf States Reorg. Grp., Inc. v. Nucor Corp.*, 466 F. 3d 961, 967–68 (11th Cir. 2006) (antitrust injury sufficiently alleged where exclusion of one competitor from the relevant market is inseparable from the alleged harm to competition)). Force Partners argues that it cannot compete for access in response to the program initiated by Defendants because it does not have the dominant market share that KSA and Acuity have. *Id.* at 11. Force Partners has adequately alleged that KSA used its dominant market share to force distributors to boycott Force Partners and its brands, thereby depriving

distributors and their customers from a meaningful choice in the market. *See* FAC ¶¶ 5, 9. The issue before the Court on a Rule 12(b)(6) motion is whether the complaint contains factual allegations, accepted as true, which state a claim to relief that is plausible on its face. The role of the Court is not to determine whether the evidence supports the plaintiff's claim. Here, in viewing the allegations of the FAC in the light most favorable to Force Partners, as it must, the Court finds that it has plausibly alleged that Defendants' program harmed the competitive process.

Acuity also argues that Force Partners' claim fails against it specifically, because Force Partners, a sales representative, is not a competitor of Acuity, a manufacturer. KSA Reply at 6. The Court notes that Acuity did not raise this argument until its reply. A party waives an argument when it raises it for the first time on reply. *See Narducci v. Moore*, 572 F.3d 313, 323 (7th Cir. 2009). Nonetheless, the Court finds that, at this stage, Force Partners has adequately alleged that Defendants' program forced distributors to boycott KSA's primary competitor and the exclusive sales representative of Eaton/Cooper, "a very significant competitor to Acuity" off of the shelves and out of competition for specifications. FAC ¶ 83. Accordingly, for the purposes of the rule of reason analysis, the Court finds that Force Partners has plausible alleged an anticompetitive effect as a result of Defendants' program.

Based on the Court's findings regarding the various components of Force Partners' Section 1 claim under Count I, the Court denies Defendant's motion with respect to Count I.

## I. Hub-and-Spoke Agreement (Count II, All Defendants)

In Count II, Force Partners alleges that Defendants engaged in a conspiracy to require distributors of electrical lighting equipment to deal exclusively with Defendants, ultimately resulting in higher prices and reduced output. FAC ¶ 128. Force Partners claims that this conspiracy is horizontal in nature, with Defendants acting as the hub of the scheme and the distributors who were coerced into the boycott as the spokes. *Id.* ¶ 130. As stated above, a hub-and-spoke conspiracy requires not only vertical agreements between the hub (here, Defendants) and each spoke (here, the distributors), but also a horizontal agreement among the various spokes with each other. *Marion Healthcare*, 952 F.3d at 842.

Defendants, in both motions to dismiss, seek dismissal of Count II on the basis that Force Partners does not plead a horizontal agreement, as it fails to allege any agreement between the spokes—the distributors—but rather only alleges vertical exclusive distributorships (which are addressed under the rule of reason, as discussed above). KSA Memo. Dismiss at 13;[11] Acuity Memo. Dismiss at 10–12. Defendants maintain that *Marion Healthcare* controls because in that case, the Seventh Circuit dismissed a complaint that failed, like the FAC here, to allege that the distributors agreed to the manufacturer's scheme to raise prices on the condition that their competitors would do the same. Acuity Memo. Dismiss at 11–12 (citing *Marion Healthcare*, 952 F.3d at 841–42).

---

[11]The KSA Defendants' motion to dismiss raises this argument in just one sentence, expanding upon the argument in reply. KSA Reply at 6–7.

Not surprisingly, Force Partners disagrees and insists that Count II pleads a horizontal agreement. Pl. KSA Resp. at 23–27; Pl. Acuity Resp. at 13–17. Specifically, Force Partners counters that it pleads sufficient facts to support an inference that the distributors conspired among each other. Pl. Acuity Resp. at 16. Force Partners contends that *Marion Healthcare* is distinguishable, and the Court agrees. In *Marion Healthcare*, the plaintiff alleged no facts showing that the distributors played a role in the anti-competitive pricing or "knowingly engaged in parallel anticompetitive conduct;" rather, the plaintiff only alleged that the distributors enforced the terms of the contracts negotiated between the manufacturer and another third party. 952 F.3d at 843. That is not the case here with respect to the FAC: as discussed above, Force Partners alleges that the distributors knowingly entered into agreements with the Defendants to boycott Force Partners and its brands. *See supra* Section I.G (citing FAC ¶¶ 12, 37–40, 46–47, 49, 73, 82–84, 97–99, 106–112, 129, 145, 147, 152)).

Force Partners leans heavily on *Toys "R" Us*, 221 F.3d 928. Pl. Acuity Rep. at 13–17. In that case Toys "R" Us had sent letters to major toy manufacturers, indicating that it would not carry the manufacturers' toys unless the manufacturers agreed to withhold certain highly desirable toys from warehouse clubs. 221 F.3d at 935. The FTC found that it would not have made economic sense for any individual manufacturer to capitulate to these demands unless it knew that its competitors would also play along. *Id.* at 935–36. That finding, concluded the Seventh Circuit, was supported by substantial evidence. *Id.* at 936. It was thus permissible to infer that even if the manufacturers did not expressly agree to join a conspiracy with one

another, they had functionally joined the conspiracy because they were assured that their competitors would all follow the same anticompetitive strategy. *Id.*

Defendants reply that *Toys "R" Us*, is inapplicable, as that "case involved 'vertical agreements between Toys "R" Us, and the individual manufacturers,' all of which 'promised to restrict distribution of [their] products to low priced warehoused club stores,' but only '*on the condition that other manufacturers would do the same.*'" KSA Reply at 6 (quoting *Toys "R" Us*, 221 F.3d at 932); Acuity Reply at 11. They argue that the FAC does not support an inference that the distributors agreed amongst themselves to join the program or that the distributors joined only on the condition that all other distributors would do the same. Acuity Reply at 12–14; KSA Reply at 7.

After briefing had concluded, Force Partners submitted additional authority in support of its position that Force Partners adequately alleged a hub-and-spoke conspiracy. R. 65, Mot. Suppl. Auth. (citing *Preston Hollow Cap. LLC v. Nuveen LLC*, 2021 WL 3542255, at *14 (S.D.N.Y. Aug. 10, 2021)). Defendants jointly responded to the motion, arguing that *Preston Hollow* is distinguishable. R. 67, Resp. Suppl. Auth. Although the facts of *Preston Hollow* are similar to those alleged by Force Partners, the Court agrees with Defendants that there are key differences.

In *Preston Hollow*, the plaintiff, a municipal bond buyer, alleged its competitor had organized a hub-and-spoke conspiracy to boycott the plaintiff. 2021 WL 3542255, at *15. The plaintiff alleged that its competitor forced various underwriter-broker-dealers (UBDs) to have the UBDs agree not to make future sales to the plaintiff. *Id.*

28

The competitor told the UBDs that it would stop doing business with them unless they agreed to boycott the plaintiff. *Id.* The court found that it was "central to [the competitor's] efforts to orchestrate a boycott of [plaintiff] to let UBDs [] know that UBDs were being offered the same choice of either doing business with [plaintiff] or with [the competitor]." *Id.* The complaint contained numerous allegations of the competitor's statements to UBDs about its agreements with other UBDs. *Id.* (the competitor told one UBD that its actions were "uniform across the street"; it told another UBD that it was "going to every single bank and [UBD] today to examine what is the extent [with plaintiff], and the policy going forward is that if . . . [they were] actively doing business with [plaintiff, the competitor] will not be doing business with [them]"; the competitor told a bank that it had "firm commitments from four UBDs"; and two UBDs "specifically asked for and received assurances from [the competitor] that all [UBDs] were complying.").

Force Partners argues that it has alleged sufficient facts from which the Court can infer that the distributors knew that other distributors entered into agreements with KSA and that distributors would not have entered into such agreements without assurances that other distributors agreed as well. Pl. KSA Resp. at 25; Pl. Acuity Resp. at 16. Specifically, Defendants made the Presentation to the distributors in the same month, August 2019. Pl. Acuity Resp. at 13 (citing FAC ¶¶ 5, 9, 70, 72–74, 77). Moreover, Force Partners alleges that Jim told at least one distributor that it was the "only one in town" who had not agreed to go along with the scheme. Pl. Acuity Resp. at 14 (citing FAC ¶¶ 87, 103). Although these allegations show that the distributors

had a more active role in the scheme than the distributors in *Marion Healthcare*, the Court finds that the FAC does not support the inference beyond a speculative level that the distributors knew that the other distributors agreed to the Proposal, much less that the distributors agreed to the Proposal only on the condition that other distributors were doing so.

Although the Court agrees with Force Partners that entering into the agreement with KSA was not in the distributors' best interest, as having access to a range of brands is important in the market, and the distributors told Force Partners that their customers would be "angry if they could not get Force Partners brands," Pl. Acuity Resp. at 13 (citing FAC ¶¶ 47, 85, 98, 118), that is not enough. *See Toys "R" Us*, 221 F.3d at 936 (entering into the agreement was not in the manufacturers' best interest *and* evidence presented that the manufacturers entered into the agreement on the condition that other manufacturers also agreed); *Preston Hollow*, 2021 WL 3542255, at *15 (finding that the horizontal conspiracy was adequately alleged because allegations supported reasonable inferences that "it would be more advantageous for an individual UBD to join the conspiracy only if other UBDs agreed to do so" and the defendant-competitor "recognized it was necessary to have a large percentage of the leading UBDs agree to the boycott, but *also for the UBDs to know that their competitors had agreed to it*") (emphasis added).

The Court finds that Force Partners has not sufficiently alleged a horizontal agreement in the context of Section 1 of the Sherman Act. Therefore, Count II is dismissed. Force Partners did not request that it be allowed to amend its complaint

if any claims are dismissed; as such, the dismissal is with prejudice. *See Haywood v. Massage Envy Franchising, LLC*, 887 F.3d 329, 335 (7th Cir. 2018) ("Nothing in Rule 15, nor in any of our cases, suggests that a district court must give leave to amend a complaint where a party does not request it or suggest to the court the ways in which it might cure the defects. To the contrary, we have held that courts are within their discretion to dismiss with prejudice where a party does not make such a request or showing.").

## II.     Section 2 of the Sherman Act (Count III)

In Count III, Force Partners alleges that Defendants attempted to monopolize the Market in violation of Section 2 of the Sherman Act. FAC ¶¶ 135–59. To state an attempted monopolization claim, a plaintiff must adequately plead "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of obtaining monopoly power." *Hon Hai Precision Indus. Co. v. Molex, Inc.*, 2009 WL 310890, at *2 (N.D. Ill. Feb. 9, 2009) (citing *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993)). The KSA Defendants argue that Force Partners' Section 2 claim fails because: (1) Force Partners fails to allege sufficient exclusionary or anticompetitive conduct; and (2) Force Partners has not pleaded a dangerous probability of success. KSA Memo. Dismiss at 16–21. As noted above, Acuity focuses its argument on its premise that Force Partners has not pled facts sufficient to show that the agreements between KSA and the distributors were "exclusive." Acuity Memo. Dismiss. at 4–7. The Court disagrees with the KSA Defendants and Acuity.

To summarize, in Count III, Force Partners alleges that Defendants have engaged in an attempt to acquire a monopoly in the Market and have used anticompetitive means to do achieve this end; put another way, Defendants *have not* achieved their monopoly in the market based upon superior products, business acumen, or historical accident. FAC ¶¶ 136, 138. Force Partners further alleges that Defendants "demonstrated a specific intent to monopolize the market by announcing and implementing a scheme to eliminate competition from the market." *Id.* ¶ 137.

The Court addresses the dangerous probability of success argument first, before moving on to the exclusivity argument.

## A. Dangerous Probability of Success

The KSA Defendants argue contend that Force Partners has not adequately alleged a dangerous probability of success for two reasons: (1) Force Partners fails to allege a relevant antitrust market; and (2) Force Partners fails to allege that KSA has the required market power. KSA Memo. Dismiss at 19–21.

### 1. Antitrust Market

A plaintiff has the burden of defining the relevant market. *Spectrum Sports*, 506 U.S. at 455. "The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Right Field Rooftops, LLC v. Chi. Baseball Holdings, LLC*, 87 F. Supp. 3d 874, 886 (N.D. Ill. 2015) (quoting *Reifert v. S. Cent. Wis. MLS Corp.*, 450 F.3d 312, 320 (7th Cir. 2012)). As Force Partners notes, in most cases, "proper market definition can be determined only after a factual inquiry into

the commercial realities faced by consumers." *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997); *see also Avnet, Inc. v. Motio, Inc.*, 2015 WL 5307515, at *4 (N.D. Ill. Sept. 9, 2015) ("[B]ecause market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market.") (internal citations omitted) (collecting cases). Motions to dismiss based on a failure to define the market "may be granted only if the alleged market makes 'no economic sense under any set of facts.'" *PepsiCo, Inc. v. Coca–Cola Co.*, 1998 WL 547088, at *6 (S.D.N.Y. Aug. 27, 1998).

Force Partners defines the relevant market as "the lighting and controls for buildings and private roadways," sold by "full line" sales representatives like Force Partners and KSA within a defined geographic market comprised of sixteen Illinois counties in Northern Illinois and surrounding Chicago, including three counties in Northwest Indiana. FAC ¶¶ 28, 30. As discussed above, Force Partners alleges that lighting and controls manufacturers like Acuity contract with exclusive sales representatives within certain geographic markets, so distributors (and their customers) can only obtain manufacturers' products through the exclusive sales representatives. *Id.* ¶ 29. Specifications—which constitute approximately 65% of Force Partners' sales—sometimes list only one manufacturer's name, sometimes list up to three manufacturers' names and invites competition, and some reference one manufacturer but allow another manufacturer to provide a quote so long as it meets the technical requirements of the design. *Id.* ¶¶ 44, 47.

The KSA Defendants do not contest that Force Partners adequately alleges a geographic market, but instead focus their arguments on the product market, contending that it is impermissibly vague because it provides insufficient information about what products are included in the proposed market. KSA Memo. Dismiss at 19 (citing *Cupp v. Alberto-Culver USA, Inc.*, 310 F. Supp. 2d 963, 971 (W.D. Tenn. 2004)). The court in *Cupp* held that the alleged product market, defined as "exclusive salon hair care products . . . sold exclusively through salons under the advice of professional hair stylists," was "fatally vague," because it did not include the names of the brands and suppliers to be included in the market. 310 F. Supp. 2d at 970–71. It is true that, in the FAC, Force Partners does not name every manufacturer's brand sold in the geographic market. But Force Partners does name the other sales representatives that sell the lighting and control products in the geographic market, and lists the specific lighting and control products sold by those sales representatives. FAC ¶¶ 28, 43. The Court finds, at the motion to dismiss stage, that Force Partners' allegations about the product market are sufficient as to what products are included in the proposed market.

The product market is also legally insufficient, argue the KSA Defendants, because Force Partners "did not 'define its relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand.'" KSA Memo. Dismiss at 19 (citing *Queen City Pizza*, 124 F.3d at 436); KSA Reply at 8. The Court again disagrees. Force Partners alleges that distributors can only obtain the relevant lighting and controls products (defined in paragraph 28 of the FAC) from a

manufacturer's exclusive sales representative, and that there are relatively few full-line sales representatives in this geographic market. FAC ¶¶ 28–29, 34. Therefore, "it is not easy to obtain a sale's representative's products through other means or channels." *Id.* ¶ 34. The Court finds the product market is similar to that defined in *Hannah's Boutique*, which the court held were sufficient to withstand a motion to dismiss. 2013 WL 4553313, at *5 ("Indeed, the relevant market here is also particularly narrow—lacking interchangability—because it relates to dresses obtained from particular designers."). The Court finds that the FAC adequately pleads a relevant geographic and product market.

## 2. Market Power

The KSA Defendants maintain that Force Partners' allegations relating to KSA's percentage of business do not relate to the market alleged by Force Partners. KSA Memo. Dismiss at 20–21. The Court agrees with Force Partners that, at the motion to dismiss stage, it sufficiently pleads that KSA has market power. Pl. KSA Resp. at 35. Force Partners alleges that all sales of the lighting and controls products must go through a manufacturer's exclusive sales representative, and that KSA is the dominant sales representative in the market. *Id.* (citing FAC ¶¶ 5, 10, 37, 40, 43, 52; *GN Netcom, Inc. v. Plantronics, Inc.*, 967 F. Supp. 2d 1082, 1085 (D. Del. 2013) (motion to dismiss denied where, in response to the competitor's entry, a company with 75% of sales in a specialized market demanded that specialized distributors agree to exclusive dealing program and many did)).

The Court finds that the Force Partners' allegations about KSA's market power and coercive behavior towards the distributors satisfy the "dangerous probability of success" element of a Section 2 claim. *See, e.g., United States v. Dentsply Int'l, Inc.,* 399 F.3d 181, 184, 187 (3d Cir. 2005) (denying motion to dismiss, observing that the defendant "imposed" an exclusivity policy on its customers and caused inventory of competing products to be removed from shelves and stating "[b]ehavior that might otherwise comply with antitrust law may be impermissibly exclusionary when practiced by a monopolist").

## B. Exclusive Agreements

Acuity argues that Force Partners has not pled facts sufficient to show that the agreements between KSA and the distributors were "exclusive." Acuity Memo. Dismiss at 6–7. Rather, Acuity asserts that the Force Partners has alleged only a loyalty program, not an exclusion from the marketplace. *Id.* at 6. Acuity contends that "the 'Partner' program does not require that distributors must *only do* business with KSA to qualify as a Partner; rather, distributors just must not do business with Force Partners or two other firms." *Id.* (emphasis in original). Similarly, the KSA Defendants argue that Defendants' "unilateral *invitation* to each distributor does not constitute [an] agreement, much less an antitrust violation." KSA Memo. Dismiss at 11 (emphasis in original). In support, the KSA Defendants note that the Seventh Circuit has found that no actionable agreement exists where a supplier induces dealers to follow its exclusive policy or guideline—and even terminates non-complaint dealers. *Id.* at 11–12 (citing *Roland Mach. Co. v. Dresser Indus., Inc.,* 749 F.2d 380,

393 (7th Cir. 1984)). The KSA Defendants note that the incentives offered to Partners by Defendants, such as "best prices" and services" "represent[] robust competition, not a conspiracy in violation of Section 1." *Id.* at 12 (citing, among other cases, *Concord Boat*, 207 F.3d at 1061). Moreover, both motions to dismiss point out that the program contains an important exception: when a customer specifically requests a Force Partners brand, then the distributor is allowed to sell the requested product without harming its status as a KSA "partner." Acuity Memo. Dismiss. at 7; *see also* KSA Memo. Dismiss at 22 (citing *Alarm Detection Sys. v. Orland Fire Prot. Dist.*, 129 F. Supp. 3d 614, 635 (N.D. Ill. 2015)). Without actual exclusion, reason Defendants, there can be no substantial lessening of competition. *Id.*

Force Partners retorts that Defendants seek to recast the allegations in the FAC. Pl. KSA Resp. at 22; Pl. Acuity Resp. at 8–9. Nowhere in the FAC, observes Force Partners in response to Acuity's motion to dismiss, does Force Partners allege that the agreement is a "loyalty program." Pl. Acuity Resp. at 8. Rather, insists Force Partners, it has alleged that the terms "Partner" and "Associate" are meaningless. *Id.* Similarly, Force Partners points out the term "best prices" is undefined and certainly does not demonstrate competition rather than a conspiracy. Pl. KSA Resp. at 22. The choice that was presented to distributors was to go along with the agreement or lose meaningful access to KSA-represented brands, including Acuity. *Id.* at 37; Pl. Acuity Resp. at 8. Moreover, Force Partners explicitly alleges that the choice offered was a false one; distributors understood, and KSA's history supported, that if distributors did not agree to become KSA "Partners," they would be "cut off" from the brands

37

represented by KSA. *Id.* ¶ 90. Force Partners maintains that all it is required to plead is that there was an agreement, and that agreement was likely to have a substantial though not necessarily immediate anticompetitive effect. *Id.* at 10 (citing *Roland*, 749 F.2d at 392).

The Court agrees with Force Partners that it has adequately alleged that the agreements were "exclusive." Force Partners alleges that the choice KSA offered its distributors was really a Hobson's choice (an illusion that multiple choices are available when the only choice is to take what is available or nothing at all)—the distributors must agree to boycott Force Partners or lose access to KSA-represented brands, including Acuity. FAC ¶ 90. Stock and Flow distributors, according to the FAC, were informed that they could not carry Force Partners' brands on their shelves at all, and spec distributors were told they had to "rig bids to ensure that KSA won any multiple-name specifications that also included [Force Partners]." Pl. Acuity Resp. at 8–9 (citing FAC ¶ 87). Furthermore, where KSA brands and Force Partner brands were specified for bidding on a project, the distributors were given the choice of not quoting Force Partners' brand at all or providing Force Partners' confidential pricing information to KSA so it could match the price. *Id.* (citing FAC ¶¶ 80–81). All in all, the Court finds that Force Partners has adequately alleged that the agreements were exclusive. That, however, without more, does not mean that the agreements violate antitrust laws.

Next, Acuity argues that the FAC fails to overcome the presumption that exclusivity agreements are lawful. Acuity Memo. Dismiss at 4–5 (citing *Paddock*

*Publ'ns, Inc. v. Chi. Tribune Co.*, 103 F.3d 42 (7th Cir. 1996); *Republic Tobacco*, 381 F.3d at 736); *see also* KSA Memo. Dismiss at 16. In fact, argues Acuity, as pled, the agreements could not harm competition, as they themselves are a form of competition. *Id.* at 6. In a now-familiar refrain, Force Partners responds that Acuity misconstrues the allegations of the FAC: Force Partners does not allege that exclusivity agreements are unlawful, but rather that Defendants set up a plan that changed how distributors operate. Pl. Acuity Resp. at 4. In other words, Force Partners alleges that Defendants coerced distributors into agreeing to the plan with the aim of forcing a competitor out of the market. *Id.* at 4; Pl. KSA Resp. at 20.

As for Defendants' argument that exclusive agreements are presumed valid, that presumption is inapplicable here. "Exclusive dealing arrangements violate antitrust laws only when they foreclose competition in a substantial share of the line of commerce at issue." *Republic Tobacco*, 381 F.3d at 737–38. "The objection to exclusive-dealing agreements is that they deny outlets to a competitor during the term of the agreement." *Roland*, 749 F.2d at 393. As the KSA Defendants point out, in *Roland*, the Seventh Circuit found that the district court improperly issued a preliminary injunction where the defendant supplier induced the dealer to agree to follow its exclusive policy and terminated a non-complaint dealer. *Id.* at 392–93. However, the Court disagrees with the KSA Defendants that *Roland* requires that the Court grant their motion to dismiss. Rather, the Court agrees with Force Partners that *Roland* is of limited utility at this stage, given that it is a preliminary injunction case, which not only applied a different standard than a Rule 12(b)(6) motion, but

also turned on whether there was in fact *evidence* of an anti-competitive agreement—which the Seventh Circuit concluded there was not. *Id.* at 393–94. The decision did not foreclose the plaintiff's claim in *Roland*, the Court simply declined to impose a preliminary injunction. *Id.* at 395–96 ("It should go without saying that . . . our discussion of the merits of Roland's antitrust claim is tentative. We do not exclude the possibility that on the fuller record made in the trial on the merits Roland will succeed in establishing its claim."). The Seventh Circuit held that, to find that an exclusive-dealing agreement is unreasonable, a plaintiff must show first, "that it is likely to keep at least one significant competitor of the defendant from doing business in a relevant market" and second, "that the probable (not certain) effect of the exclusion will be to raise prices above . . . the competitive level, or otherwise injure competition." *Id.* at 394.

The Court agrees with Force Partners that the crux of the FAC is that the program enacted by the Defendants, specifically the program's exclusivity, is unlawful because its purpose was to drive out of business a competitor, which, as discussed in more depth below, Force Partners plausibly alleges would harm the market.

## C. Terminable at Will

Acuity further asserts that because the agreements are terminable at will, they do not prevent Force Partners from continuing to compete. Acuity Memo. Dismiss at 9–10 & n.15 (citing, among other cases, *Paddock Publ'ns.*, 103 F.3d at 47; *Roland Mach.*, 749 F.2d at 395). Put differently, Acuity argues there are no barriers to Force

40

Partners' ability to offer distributors a better deal, and that Force Partners does not allege that it attempted to "woo a distributor out of the KSA 'Partner' program by offering the distributor better prices or services of its own." *Id.*; Acuity Reply at 9. Force Partners counters that there is no rule that if an exclusive agreement can be terminated in less than a year, no antitrust claim maybe asserted. Resp. at 12–13.

Although the Court must follow the Seventh Circuit's precedent that "[e]xclusive-dealing contracts terminable in less than a year are presumptively lawful under section 3," *Roland Mach.*, 749 F.2d at 395, the Court agrees with Force Partners that the facts alleged in the FAC overcome this presumption. Pl. Acuity Resp. at 12. True, even though Force Partners does not explicitly allege that it offered the distributors that were coerced into the program lower prices in order to "outbid" KSA, Force Partners nonetheless claims that it spoke to the distributors after the presentation, and "[a]ll of the Distributors reported that they could not afford to lose access to KSA's products." FAC ¶ 98. Moreover, Force Partners alleges that, "[i]n an effort to test the market, Force Partners has offered steeply discounted prices – prices it is confident are lower than KSA's – to win spec jobs in Northwest Indiana," where KSA controls about 90% of sales in the market, but that "[v]irtually none have been successful." FAC ¶¶ 55–56.

These allegations distinguish this case from *Paddock Publ'ns*, where the Seventh Circuit affirmed dismissal of the plaintiff's claims where the plaintiff did not allege that it attempted to outbid its competitors, nor allege any other meaningful restraint on trade. 103 F.3d at 44, 47. The statements Force Partners claims

distributors made to it after they agreed to Defendants' program demonstrate that the practical effect of the agreement—given KSA's dominant market share—was that the distributors could not terminate the agreement to participate at will and engage with Force Partners. *Dentsply*, 399 F.3d at 193 (the defendant's large market share and conduct excluding competitors "realistically ma[d]e the arrangements . . . as effective as those in written contracts" despite only consisting of a series of independent sales"); *Minn. Mining & Mfg. Co. v. Appleton Papers, Inc.*, 35 F. Supp. 2d 1138, 1144 (D. Minn. 1999) (considering "practical effect" rather than "form" in determining whether agreement was terminable at will). The Court finds that, regardless of whether the distributors could technically terminate the agreements at will, the practical effect was that the distributors could not exit Defendants' program and contract with Force Partners instead.

### D. Disparaging or False Statement to Distributors

Because the Court finds that Force Partners has adequately alleged that Defendants' agreements with the distributors are exclusive and harm the market, the Court need not address Defendants' argument that the allegations about KSA Defendants' false statements fail to state a Section 2 claim. KSA Memo. Dismiss at 17; Acuity Memo. Dismiss at 13.

The Court finds, in viewing the allegations of the FAC in the light most favorable to Force Partners as the non-movant and drawing all reasonable inferences in its favor, as the Court must, that Force Partners has plausibly stated a cause of action for a violation of Section 2 of the Sherman Act.

42

### III.    Clayton Act (Count IV)

In Count IV, Force Partners alleges that the restrictive scheme imposed by the Defendants violates Section 3 of the Clayton Act as an illegal exclusive dealing agreement. FAC ¶¶ 160–64. The Clayton Act prohibits certain exclusive contracts for the sale of goods. 15 U.S.C. § 14. Defendants again argue that Force Partners has failed to plausibly plead a "substantial anticompetitive effect" as required by Section 3 of the Clayton Act. KSA Memo. Dismiss at 21–22; Acuity Memo. Dismiss at 8. For the same reasons discussed above, *supra* Section I.H, at the motion to dismiss stage, the Court finds that Force Partners has adequately alleged the program had a substantial anticompetitive effect.

The KSA Defendants again offer additional arguments in support of dismissal, contending that (1) Force Partners failed to allege the existence of an exclusive dealing contract; (2) even if Force Partners did allege a contract, it was not for *goods*, but rather for *services*; and (3) Force Partners fails to plead a relevant market. For the reasons discussed above, *see supra* Sections II.A.1, II.B, the Court disagrees as to the first and third arguments. And the Court easily discards the second argument as well. Force Partners pleads that the agreements in place were to deny both goods and services. FAC ¶ 119 ("Through coercive demands and threats, the Defendants agreed between themselves to deny services, and effectively *deny access to KSA brands* to Market Distributors unless those Distributors terminated their relationship with and/or agreed to boycott Force Partners") (emphasis added).

The Court therefore finds that Force Partners has plausibly alleged that Defendants' exclusive dealing agreement violated Section 3 of the Clayton Act. The Court denies Defendants' motions with regard to Count IV.

## IV.    Illinois Antitrust Act (Count V)

In Count V, Force Partners alleges that Defendants' conduct also violates the Illinois Antitrust Act, 740 ILCS 10/2. FAC ¶ 166. Force Partners asserts claims under 740 ILCS 10/3(1)–(4). *Id.* ¶¶ 167–72.

The Illinois Antitrust Act expressly requires harmonization with the federal laws. 740 ILCS 10/11 ("When the wording of this Act is identical or similar to that of a federal antitrust law, the courts . . . shall use the construction of the federal law by the federal courts as a guide in construing this Act."). That is, courts look to the application of the federal counterpart to guide analysis of the state antitrust law claims. *State of Ill., ex rel. Burris v. Panhandle E. Pipe Line Co.*, 935 F.2d 1469, 1479–80 (7th Cir. 1991) (Illinois courts "use the construction of federal antitrust law by federal courts to guide their construction of . . . state antitrust laws"). Put another way, if the federal claims are dismissed, the equivalent state claims should be dismissed. *VBR Tours, LLC v. Nat'l R.R. Passenger Corp.*, 2015 WL 5693735, at *16 (N.D. Ill. Sept. 28, 2015) ("Illinois Antitrust Act claims will stand or fall with federal . . . claims based on the same underlying facts and legal theories.").

As the KSA Defendants point out, claims under 740 ILCS 10/3(2) and (3), which Force Partners pleads in paragraphs 169 and 171 of the FAC, are substantially similar to, and construed in the same ways, as vertical conspiracy claims under

44

Sherman Act Sections 1 and 2, respectively. KSA Memo. Dismiss at 23 (Citing *Hannah's Boutique*, 112 F. Supp. 3d at 765 n.7); *see also* Acuity Memo. Dismiss at 4 n.2 (citing *Tamburo v. Dworkin*, 601 F.3d 693, 700 (7th Cir. 2010)). And, claims under 740 ILCS 10/3(4), which Force Partners pleads in paragraph 172 of the FAC, are substantially similar to, and construed in the same ways as, Clayton Act Section 3. KSA Memo. Dismiss at 23 (citing *Ray Dancer, Inc. v. DMC Corp.*, 594 N.E.2d 1344, 1350 (Ill. App. Ct. 1992)). Accordingly, for the same reasons that Force Partners' Sherman Act Section 1 vertical conspiracy claim (Count I), Sherman Act Section 2 claim (Count III), and Clayton Act claim (Count IV) are plausibly alleged, these state law claims likewise survive Defendants' motions to dismiss.

However, the Court agrees with the KSA Defendants that Force Partners' claim under 740 ILCS 10/3(1) must fail. KSA Memo. Dismiss at 23–24. Section 3(1) of the Illinois Antitrust Act "is *expressly limited* to agreements between two classes of persons: (a) those who are competitors and (b) those persons who, but for a prior agreement, would be competitors." 740 Ill. Comp. Stat. 10/3 Bar Committee Comments–1967 (emphasis added). "Section 3(1) does not reach vertical agreements." *Id.*; *see also Sportmart, Inc. v. No Fear, Inc.*, 1996 WL 296643, at *17 (N.D. Ill. June 3, 1996). For the reasons stated above, the Court finds that Force Partners has failed to allege a horizontal agreement. *See supra* Section I.I. Force Partners does not disagree that a Section 3(1) claim can be premised only on a horizontal agreement. Rather, Force Partners simply states in opposition that it agrees that the same basic law applies to its Illinois Antitrust Act claims as it does to the Sherman and Clayton

45

Act claims, and "[b]ecause those all are plausibly and properly pleaded, Count V cannot be dismissed." Pl. KSA Resp. at 38. Therefore, because Force Partners has failed to adequately allege a horizontal agreement, its claim under Section 3(1) of the Illinois Antitrust Act also fails.

For the foregoing reasons, Defendants' motions to dismiss are denied as to Force Partners' Count V claims premised on 740 ILCS 10/3(2)–(4), but are granted to as to the claim premised on 740 ILCS 10/3(1).

## V.    IUDTPA (Count VI)

In Count VI, Force Partners alleges that Defendants violated the IUDTPA, 815 ILCS 510/2, by disparaging the quality of the goods, services, or business of Force Partners based on the Presentation, which conveyed to distributors that they should boycott Force Partners based on the false statement that Force Partners was bypassing distributors to make sales directly to end-users and contractors, thereby denying sales and profits to distributors. FAC ¶ 176. Pursuant to the IUDTPA, "[a] person engages in a deceptive trade practice when, in the course of his or her business, vocation, or occupation, the person," among other things, "represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he or she does not have." 815 ILCS 510/2.

Defendants move to dismiss Count VI on the basis that because it sounds in fraud, it must satisfy the heightened pleading requirement of Rule 9(b) and fails to

do so. Acuity Memo. Dismiss at 13–14 (citing *Platinumtel Commc'ns, LLC v. Zefcom, LLC*, 2008 WL 5423606, at *1 (N.D. Ill. Dec. 30, 2008)); KSA Memo. Dismiss at 25–26 (citing *Nakajima All Co., Ltd. v. SL Ventures Corp.*, 2001 WL 641415, at *6 (N.D. Ill. June 4, 2001); *CardioNet, Inc. v. LifeWatch Corp.*, 2008 WL 567031, at *3 (N.D. Ill. Feb. 27, 2008)). Force Partners concedes that Rule 9(b)'s heightened pleading standard applies to its IUDTPA claims, as it does not dispute the standard in its response briefs. *See* Pl. Acuity Resp. at 17–19; Pl. KSA Resp. at 39–41; *see Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument . . . results in waiver."). The Court nonetheless agrees with Defendants that Rule 9(b) is the proper standard under which to evaluate IUDTPA claims. *See CardioNet, Inc.*, 2008 WL 567031, at *2 (collecting cases). Rule 9(b) requires that, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "Under Rule 9(b), . . . IUDTPA . . . []claims must allege 'the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated.'" *CardioNet, Inc.*, 2008 WL 567031, at *3 (quoting *Bankers Trust Co. v. Old Republic Ins. Co.*, 959 F.2d 677, 683 (7th Cir. 1992)).

Specifically, Defendants argue that Force Partners fails to provide any information as to the "who, what, when, where and how of any fraudulent statements by Acuity." Acuity Memo. Dismiss at 13–14; KSA Memo. Dismiss at 25–26. Force Partners retorts that it sufficiently alleges the time, place, and content of KSA's

August 2019 PowerPoint Presentation. Pl. KSA Rep. at 40–41; Pl. Acuity Resp. at 18–19. The Court disagrees. Although Force Partners alleges the general timeframe of the presentations (August 2019), and the content (statement that Force Partners was bypassing distributors to make direct sales to end-users), it fails to allege with specificity the place of the statements—specifically, it alleges only generally that the statement was made to the "distributors" but does not plead specifically to which distributors the statements were made.

Additionally, assert Defendants, Force Partners' IUDTPA claim fails because Force Partners does not allege that Defendants made a commercially disparaging statement about the quality of Force Partners' goods or service. Acuity Memo. Dismiss at 14; KSA Memo. Dismiss at 24–25. The KSA Defendants also argue that the FAC suggests that the statement at issue may well be true, and thus is not actionable under the IUDTPA. KSA Memo. Dismiss at 25.

Force Partners counters that it has plausibly alleged a claim under Section 2(a)(8) of the IUDTPA for disparagement of Force Partners' services or business. Pl. Acuity Resp. at 17–19 (citing, among other cases, *World Kitchen, LLC v. The Am. Ceramic Soc'y*, 2015 WL 5461564 (N.D. Ill. Sept. 15, 2015) *M&R Printing Equip., Inc. v. Anatol Equip. Mfg. Co.*, 321 F. Supp. 2d 949 (N.D. Ill. 2004)); Pl. KSA Resp. at 39–41 (citing same). As for the cases cited by Defendants, those cases, according to Force Partners, are all distinguishable.

The Court agrees with Defendants and finds that Force Partners fails to allege an actionable disparaging statement under the IUDTPA. The only allegedly false

statement pled with specificity is that "KSA claimed that Force Partners was bypassing distributors to make sales directly to end-users and contractors, thereby denying sales and profits to distributors." FAC ¶ 77. This statement, even if false, does not disparage Force Partners' goods or services, which is required under the IUDTPA. *See Evanger's Cat & Dog Food Co., Inc. v. Thixton*, 412 F. Supp. 3d 889, 903 (N.D. Ill. 2019); *see also Organ Recovery Sys., Inc. v. Pres. Sols., Inc.*, 2012 WL 116041, at *6 (N.D. Ill. Jan. 16, 2012) ("The statements, however, must specifically disparage a product or service and not just attack the reputation of the business or the person selling it."). Force Partners' argument that the statement "disparaged the quality of services that Force Partners provides to its distributors, by falsely claiming that Force Partners' services are not reliable because the company will go behind the back of distributors to sell directly to end-user and contractors" is too far of a stretch. Pl. KSA Resp. at 39. This is especially true because, as the KSA Defendants point out, the statement is based on "an instance in which an end user asked to make a purchase directly from a Force Partner's brand" and that Force Partners "insisted" on compensation for the relevant distributor when it "became aware of this situation." KSA Memo. Dismiss at 25 (citing FAC ¶ 78). In other words, the FAC suggests that the statement may well be true, and thus not actionable under the IUDTPA.

The Court agrees with Defendants that Force Partners fails to state a claim under the IUDTPA. Accordingly, Count VI is dismissed with prejudice.

## VI.   Tortious Interference with Prospective Business Relations
## (Count VII)

In Count VII, Force Partners asserts a claim for tortious interference with prospective business relations. FAC ¶¶ 180–90. Under Illinois law, in order to state a claim for tortious interference with business relations, the plaintiff must allege: (1) the existence of a valid business relationship; (2) defendant's knowledge of the plaintiff's relationship or expectancy; (3) purposeful interference by defendant that prevents it from happening or terminates the relationship; and (4) damages as a result. *Speakers of Sport*, 178 F.3d at 865. "Under Illinois law, commercial competitors are privileged to interfere with one another's prospective business relationships provided their intent is, at least in part, to further their businesses and is not solely motivated by spite or ill will." *Imperial Apparel, Ltd. v. Cosmo's Designer Direct, Inc.*, 882 N.E.2d 1011, 1019 (Ill. 2008).

Defendants argue that the FAC pleads statements that only reflect competition, and are therefore protected by the privilege of competition. KSA Memo. Dismiss at 26–27; Acuity Memo. Dismiss at 14–15. This privilege, also referred to as "lawful competition," "privileged competition," or "competitor's privilege," is "an affirmative defense to the tort of intentional interference with prospective business [relations]." *Gen. Motors Corp. v. State Motor Vehicle Review Bd.*, 862 N.E.2d 209, 220 (Ill. 2007) (internal citations omitted). "It allows one to divert business from one's competitors generally as well as from one's particular competitors provided one's intent is, at least in part, to further one's business and is not solely motivated by spite or ill will." *Id.* (internal quotation and citation omitted).

To overcome this defense, Defendants insist Force Partners must have alleged facts from which actual malice may be inferred. KSA Memo. Dismiss at 26–27; Acuity Memo. Dismiss at 14–15. Force Partners fails to do so, as it states in conclusory fashion that the "actions of the Defendants were undertaken with malice." Acuity Memo. Dismiss at 15; KSA Memo. Dismiss at 26–27.

Force Partners responds that it has plausibly pled that Acuity's conduct was not privileged. The privilege to compete, asserts Force Partners, does not encompass spreading false rumors or deliberate disparagement. Pl. Acuity Resp. at 19–21 (citing *Imperial Apparel*, 882 N.E. 2d at 1019 ("The privilege to compete does not, however, encompass the use of improper competitive strategies that employ fraud, deceit, intimidation, or deliberate disparagement.") (citing *Cohabaco Cigar Co. v. United States Tobacco Co.*, 1998 WL 773696 (N.D. Ill. October 30, 1998)); Pl. KSA Resp. at 41–42 (citing same). As discussed above, the Court finds that the FAC at least suggests that the one false statement pled in the FAC may be true, *supra* Section V; however, Force Partners does plead that Defendants engaged in other improper competitive strategies. For instance, Force Partners alleges that Defendants forced the distributors to "secretly share Force Partner[s'] confidential pricing with KSA so KSA can decide whether to match Force Partner[s'] prices – in the hopes of ensuring Force Partners' quotes are not presented to contractors or end users, putting Force Partners out of business, and eventually being able to charge higher prices. Architects and contractors requesting multiple bids are not advised that the bidding process is a sham, as KSA will obtain its main competitor's confidential pricing information."

51

FAC ¶ 183; *see also id.* ¶¶ 173–174, 179. The court in *Cohabaco Cigar* found the plaintiff had a cognizable Illinois tortious interference claim against a defendant who spread "false rumors" and who "attempted to drive [plaintiff] out of business through predatory pricing and other nefarious tactics." 1998 WL 773696, at *8.

The Court finds that, in viewing the allegations of the FAC in the light most favorable to non-movant Force Partners and drawing all reasonable inferences in its favor, as it must, that, like the plaintiff in *Cohabaco Cigar*, Force Partners has adequately alleged a claim for tortious interference with business relations. Therefore, the motion to dismiss Count VII is denied.

## Conclusion

For the reasons given above, Defendants' Motions to Dismiss [45], [47], are granted in part and denied in part. The Court grants Defendants' motions as to Count II (Sherman Act Section 1 horizontal conspiracy), Count V (the Illinois Antitrust Act claim premised on 740 ILCS 10/3(1)), and Count VI (IUDTPA). Those claims are dismissed with prejudice. Defendants' motions are denied as to Count I (Sherman Act Section 1 vertical conspiracy), Count III (Sherman Act Section 2), Count IV (Clayton Act Section 3), Count V (the Illinois Antitrust Act claims premised on 740 ILCS 10/3(2)–(4)), and Count VII (tortious interference with prospective business relations). The Court directs Defendants to answer the First Amended Complaint in

light of its ruling by March 18, 2022, and refers the case to Magistrate Judge Gilbert for discovery supervision and settlement.

Dated: February 25, 2022

United States District Judge
Franklin U. Valderrama